**John DAVIS et al., Plaintiffs,**

**v.**

**William BALSON et al., Defendants,**

**United States of America, Amicus Curiae.**

**No. C 73–205.**

United States District Court, N. D. Ohio, W. D.

Sept. 28, 1978.

Gerald B. Lackey, R. Michael Frank, Joseph F. Vargyas, C. Thomas McCarter, Kathleen Jolly, John Lamb, John C. Holme, Jr., Toledo, Ohio, Advocates for Basic Legal Equality, Toledo, Ohio, for plaintiffs.

Barbara J. Rouse, Columbus, Ohio, William J. Brown, Atty. Gen. of Ohio, Andrew J. Ruzicho, Louis A. Jacobs, David Latanick, Barbara E. Lapworth, Asst. Attys. Gen., for State defendants.

J. Stanley Pottinger, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Michelle C. White, Michael S. Lottman, Karen Christensen, Special Litigation, Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., for United States (amicus curiae).

Before WEICK, Circuit Judge, and WALINSKI and YOUNG, District Judges.

## OPINION and ORDER

WALINSKI, District Judge:

### PRELIMINARY STATEMENT

This civil rights action is brought as a class action on behalf of all inmates of Lima State Hospital who were committed and incarcerated in said institution on or after May 23, 1973.[1] Plaintiffs bring this action under 42 U.S.C. § 1983 to redress certain alleged deprivations of rights secured to them by the laws of the State of Ohio, and by the First, Fifth, Sixth, Eighth, Thirteenth and Fourteenth Amendments of the Constitution of the United States. Jurisdiction is predicated upon 28 U.S.C. §§ 1343(3) and (4), 2201, 2202, 2281 and 2284. Pendent jurisdiction is also alleged. Plaintiffs seek injunctive and declaratory relief, and an award of reasonable attorneys' fees.

Because plaintiffs seek to enjoin the defendants, who are officials of the State of Ohio responsible for the operation of Lima State Hospital [hereinafter cited as LSH], from the enforcement, operation and application of certain statutes of the State of Ohio, a three-judge court has been empaneled pursuant to 28 U.S.C. §§ 2281, repealed Pub.L. 94–381 §§ 1, 2, Aug. 12, 1976, 90 Stat. 1119, and 2284, amended Pub.L. 94–381 § 3, Aug. 12, 1976, 90 Stat. 1119. On June 25, 1974, the Court *sua sponte* bifurcated trial of those issues raised which may be decided by a single judge from those which must be decided by the three-judge court.

On May 21, 1974, the United States was granted leave to participate in the case as *amicus curiae*, with the right to conduct discovery, call witnesses, file motions and briefs, and present evidence and arguments, as if a party hereto. *Order*, No. C 73–205 (filed May 21, 1974).

At final pretrial, joint oral motions for summary judgment were submitted to the

---

1. Defendants have stipulated that the requirements of Rules 23(a) and 23(b)(2), F.R.Civ.P., have been satisfied, and that this action is properly maintained as a class action (Stip. 12, 13).

Court, based upon one hundred and thirty-five (135) pages of stipulations previously entered into by the parties, and numerous depositions and other materials before the Court. By pretrial order, twenty-three (23) factual disputes amenable to litigation were identified. *See Supplemental Pretrial Order*, No. C 73–205 (filed August 20, 1974) [hereinafter cited as *Pretrial Order*]. Hearing on the merits of those issues was commenced to a single judge on August 26, 1974, and concluded on August 30, 1974.

An interim *Order* was entered by the Court on September 9, 1974, wherein the Court adopted the parties' mutual contention that "the State, upon committing an individual 'until he regains his sanity', incurs a responsibility to provide such care as is reasonably calculated to achieve that goal." *Davis v. Watkins*, 384 F.Supp. 1196, 1197 (N.D.Ohio 1974) [hereinafter cited as *Interim Order*]. Based upon the authority of *Wyatt v. Stickney*, 344 F.Supp. 373, 334 F.Supp. 1341 (M.D.Ala.1972), 325 F.Supp. 781 (M.D.Ala.1971), *subsequently aff'd sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974), the Court ordered implementation of a program designed to provide minimum constitutional conditions of confinement, and to guarantee a constitutionally acceptable minimum treatment program for all inmates. Said *Interim Order* is expressly incorporated herein by reference. The Court took the twenty-three issues outlined in the *Pretrial Order, supra*, under advisement for study and opinion.

On April 2, 1975, upon plaintiffs' motion to clarify the Court's *Pretrial Order, supra*, the Court ruled that Issue Three, presenting the question whether the automatic administrative assignment to LSH of persons committed pursuant to Ohio Revised Code § 2945.38, when such persons are not so committed by the Court, is a violation of the Fourteenth Amendment, would not be reached in this case, based upon the Court's finding that plaintiffs had presented no evidence that such automatic assignments were taking place. The Court further determined that Issue Twenty, presenting the question whether denying patients at LSH the right to parole, shock parole and work

release is a violation of the Fourteenth Amendment, is properly reserved for determination by the three-judge court.

On September 1, 1976, the Court issued a *Second Interim Order* directed to Issue Fourteen, presenting the question: "Whether the Fourteenth Amendment requires the establishment of a patient advocacy program at Lima State Hospital." The Court's *Second Interim Order*, as subsequently modified, *Order Lifting Stay and Modifying Order Previously Filed*, No. C 73–205 (filed January 21, 1977), provides for the establishment of a patient advocacy program, and said *Order,* as modified, is expressly incorporated herein by reference.

While the defendants have not moved to dismiss any of the remaining twenty issues on the grounds of mootness, they have obliquely suggested that events and actions taken by them subsequent to trial of this cause have obviated any preexisting need for the Court to grant remedial relief on several of plaintiffs' claims. *See* Letter to Special Master John Czarnecki from David G. Latanick, Assistant Attorney General, September 28, 1977. However, as the Supreme Court has stated, "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant * * * free to return to his old ways.' *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)." *United States v. Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). Only "if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur", *id.,* is a case such as this rendered moot. The burden of persuasion in this regard rests upon the defendants. *United States v. W. T. Grant Co., supra,* 345 U.S. at 633, 73 S.Ct. 894. Based upon the Court's finding of multiple constitutional violations in this case, and based further upon the defendants' intransigence to date in implementing even Court ordered remedial relief, *see Order Regarding Plaintiffs' Motion to Show*

*Cause,* No. C 73–205 (filed January 21, 1977) (finding defendants in Civil Contempt for failure over a two-year period to achieve compliance with the Court's *Interim Order* of September 9, 1974), the Court finds that defendants have not met their heavy burden of establishing that their allegedly wrongful behavior could not reasonably be expected to recur. Therefore, the Court finds that this case is not moot as to any of the remaining issues. Of course, it remains for the plaintiffs to demonstrate that injunctive relief is warranted with respect to each specific claim. *Morales v. Turman,* 562 F.2d 993 (5th Cir. 1977).

This is the first in a series of Orders which will address the twenty remaining single-judge issues. Said Orders shall serve as the Court's findings of fact and conclusions of law, pursuant to Rule 52, F.R.Civ.P.

## FACTUAL BACKGROUND

Because the facts regarding the conditions and practices at LSH during the relevant time period have been largely stipulated to by the parties, the Court does not deem it necessary to make an extensive statement of facts. A brief factual statement will suffice to provide a background for the legal issues presented.

LSH is a maximum security institution for the criminally insane, operated and funded through the Ohio Department of Mental Health and Mental Retardation. LSH began receiving patients in 1915, and at the time this action was instituted housed patients in two buildings—a main (old) building with twenty-four (24) wards, dining and kitchen facilities, the "male hospital", and other facilities, and the Ascherman (new) Unit, completed in 1952, with four wards, separate dining facilities, and visiting areas. Men's wards at LSH are generally classified as strong, dormitory, or open, with descending levels of restrictions on movement. Other types of wards include observation, women's, behavior modification, and chronic medical.

The patient population at LSH was 1,295 in March, 1971; 783 on August 31, 1973, and 761 in November, 1973. Although LSH is an institution for the criminally insane, patients are committed pursuant to both criminal and civil proceedings. The patient population at LSH consists of the following classes of committees:

### Observation Patients

1) Persons accused of a crime who set up insanity as a defense, or who are under investigation by the court to determine if they are presently insane. Pursuant to Ohio Revised Code § 2945.40, such persons may be committed for thirty (30) days, during which time LSH is directed by statute to determine the mental condition of the committee.

2) Persons convicted of a crime, but not sentenced,

a. when a person has been convicted of any felony except murder in the first degree where mercy has not been recommended, or any misdemeanor, when it has been suggested or appears to the court that such person is mentally ill, or a mentally retarded offender, or a psychopathic offender, or

b. when the person has been convicted of certain sex related offenses (Ohio Revised Code §§ 2907.02, 2907.03, a felony under §§ 2907.04 or 2919.22, 2907.07, and 2907.08), or

c. when the person has been convicted of abusing, beating, torturing, starving or otherwise causing physical injury to a child.

Pursuant to Ohio Revised Code § 2947.25, such persons may be committed for an observation period not exceeding sixty (60) days, during which time the person must be examined, and a report concerning his/her mental condition prepared.

3) Parolees who appear to be suffering from a mental illness, referred by the Parole Authority to the Director of the Department of Mental Health and Mental Retardation. Such persons may be confined upon the order of the Superintendent of Parole Supervision for a period not to exceed fifteen (15) days, during which time the parolee's condition must be diagnosed,

and a recommendation of treatment made. Ohio Revised Code § 2967.22.

### Indefinite Committees

4) Persons who, after commitment for observation pursuant to Ohio Revised Code § 2947.25, *supra,* have been found to be either mentally retarded, mentally ill, or psychopathic offenders, and have had their sentences suspended, and have been indefinitely committed to the Department of Mental Health, and then assigned to LSH. Ohio Revised Code § 2947.25(E)(2). This class of committees may include juveniles, pursuant to Ohio Revised Code § 2151.-355(H).

5) Persons accused of a crime who have been found to be insane before trial, or after trial but before sentencing, and who have been indefinitely committed to LSH, pursuant to Ohio Revised Code §§ 2945.37 and 2945.38.

6) Persons acquitted in criminal proceedings on the sole ground of insanity, who have been indefinitely committed to LSH, until it is determined that their sanity has been restored, and that their release will not be dangerous. Ohio Revised Code § 2945.39.

7) Parolees who, after commitment for observation, pursuant to Ohio Revised Code § 2967.22, *supra,* have been found to be mentally ill, and consequently have been transferred by the Director of Rehabilitation and Correction to the Director of Mental Health and Mental Retardation for confinement and treatment. Ohio Revised Code § 2967.22.

8) Civilly committed transferees from other state institutions for the mentally ill or the mentally retarded who have exhibited dangerous or homicidal tendencies, rendering their presence a source of danger to others. Ohio Revised Code § 5125.03.

9) Transferees from the state's correctional, penal and reformatory institutions who have appeared to be insane, psychopathic, or mentally retarded, and who upon examination have been determined to require hospital or other special care, and consequently have been transferred. Ohio Revised Code § 5125.05.

Patients who have been convicted of crimes and those who have not are assigned to the same wards at LSH (Larimore Depo. at 102–03).

This factual statement will be supplemented as each issue is addressed. Facts stated in the present tense reflect conditions as they existed at trial. Subsequent modifications are noted when relevant. The definitions set forth in Appendix A of the Court's *Interim Order, supra,* 384 F.Supp. at 1198–1200, are expressly incorporated herein by reference.

For clarity, the issues have been numbered as they were delineated in the *Pretrial Order, supra.* However, the attention of the parties is directed to the fact that the issues are not addressed in numerical order.

### ISSUES PRESENTED

*Issue One:* Whether patients who perform work at LSH are within the protective features of the Fair Labor Standards Act. 29 U.S.C. § 201 *et seq.*

*Issue Two:* Whether failure to pay the federal minimum wage to all patients who perform work at LSH is a violation of the Fourteenth Amendment.

*Facts:*

Patients at LSH work at various jobs which range from housekeeping tasks to those which are necessary for the maintenance of the institution (Stip. 294–300). Each patient is responsible for his/her own personal housekeeping, and patients are not reimbursed for this work. A number of patients voluntarily work without pay cleaning the day hall areas. Other patients work at the request of the attendants, without pay, caring for secluded or restrained patients. These tasks include bathing, feeding, changing linen, and mopping cells (Stip. 299).

As of September 3, 1973, three hundred and five (305) patients were employed at LSH, primarily in jobs necessary for proper

administration of the hospital (Stip. 294).[2] These patients worked an average of four (4) to eight (8) hours per day, and were paid an average of ten (10) to fifteen (15) dollars per month (Stip. 298).

Generally, job assignments are made by the Industrial Work Staff Committee, which is comprised of staff from the security, nursing, activity and medical departments. It is stipulated, however, that the staff physician assigned to the Committee does not attend the meetings (Stip. 295). Work assignments are not necessarily based upon therapeutic considerations. Indeed, entire wards are assigned to a specific work detail, apparently to serve administrative convenience (Stip. 295, 296). Assignments of jobs to be performed on a particular ward are made by the attendant staff (Stip. 296).

*Conclusions of Law:*

At the time the instant case was submitted, the controlling authority on the issue of adequate compensation for work performed by patients at state mental hospitals was *Souder v. Brennan,* 367 F.Supp. 808 (D.D.C.1973), wherein the district court held that patient workers in state mental hospitals performing work of economic benefit to the institution were workers with an employment relationship to the institution and were, therefore, protected by the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* [hereinafter cited as FLSA]. Accordingly, the disputed issues presented herein were: 1) whether the benefits of the FLSA extended to patient workers who were *criminal* committees; and 2) whether payment of the federal minimum wage to civil committees, but not to criminal committees, constituted a violation of the Equal Protection Clause of the Fourteenth Amendment.

Since that time, however, the United States Supreme Court has decided the cases of *National League of Cities v. Usery,* and *State of California v. Usery,* 426 U.S. 833,

96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which presented constitutional challenges to the 1974 amendments to the FLSA by which the wage provisions of the Act were extended to almost all public employees employed by the states and their various political subdivisions. In *Usery,* the Supreme Court held invalid both the 1966 and 1974 amendments, stating that:

> insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. 1, § 8, Cl. 3 [commerce clause].

426 U.S. at 852, 96 S.Ct. at 2474. Thus, the underlying assumption of the parties regarding the applicability of the provisions of the FLSA to employees of state institutions is no longer valid.

Nonetheless, plaintiffs and *Amicus* contend that while the patient workers at LSH may not have a *statutory* right to adequate compensation for work performed which benefits the institution, they do have a *constitutional* right to receive just compensation for their labor. While the basis of this alleged constitutional right is not well articulated in the briefs, it presumably is grounded in the constitutional right to treatment.

Plaintiffs contend that the work program described above is objectionable on two grounds. First, plaintiffs argue that the nature of the work assigned is not such as will enhance the patient's self-image, or contribute to his/her recovery, and is therefore countertherapeutic. In support of this contention plaintiffs rely upon the testimony of expert witness Dr. Walter Fox, M.D., who stated that forcing people into the performance of menial tasks can be damaging to their self-image (Tr. at 237). In addition, Dr. Fox testified that requiring persons to perform certain job assignments

---

**2.** Defendants represent in their brief that only Ascherman committees (those committed pursuant to § 2947.25), and penal transferees are presently "required" to work at LSH. Defendants' Post Trial Brief at 33. The defendants further represent that no work is being done by patients other than personal and area housekeeping tasks. Defendant's Post-Trial Brief at 47.

in order to get on to a better ward is countertherapeutic, as is *forcing* people to work generally, and stated that this would be equally true with respect to both civil and criminal committees (Tr. at 238). Dr. Rudolph Buki, a staff physician at LSH, also has expressed the belief that ward-wide work assignments interfere with the therapy a patient receives (Stip. 382).

Plaintiffs' second objection to the work program at LSH goes directly to the issue of compensation. Plaintiffs assert that payment of a fair wage for all patient labor which benefits the institution is therapeutically required. Plaintiffs again direct the Court's attention to the testimony of Dr. Fox, who stated that an "extremely important component in developing a positive attitude toward one's job" is "paying people for the value of the work they do" (Tr. at 236–37). According to Dr. Fox, the value of the patient's work should be measured by whatever a person in the community would receive, adjusted downward only if the patient's disability hinders his or her performance of the job (Fox Depo. at 120–21). At trial, Dr. Fox testified that "adequate compensation would be desirable", but added, "anything is better than nothing."

Defendants presented no contrary testimony, but emphasize that portion of Dr. Fox's testimony wherein he stated that there "can be" therapeutic value in the performance of institution maintaining tasks in that "they can help relieve boredom if there aren't other activities", and they can broaden the patient's human contacts. Dr. Fox further indicated that work programs can be helpful in imparting concrete job skills and in instilling proper attitudes.

■ It is the Court's belief generally that forced participation in work programs or work assignments which are considered by professionals in the field to be countertherapeutic is violative of a patient's constitutional right to treatment. Accordingly, the Court has previously ordered that:

Repetitive, nonfunctional, degrading and unnecessary tasks (so-called "make work") such as buffing a waxed floor that has already been sufficiently buffed,

polishing brass, or shining employees' shoes shall not be required under any circumstances.

*Davis v. Watkins, supra,* 384 F.Supp. at 1208–09. It is clear from the testimony of Dr. Fox, however, that not all work assignments are countertherapeutic. Thus, the issue before the Court is what standards must be incorporated into a work program to insure that a denial of a patient's right to treatment does not result. Based upon the record, the Court finds the following standards to be required:

■ 1) Patients may be required to perform tasks of a personal housekeeping nature, such as the making of one's own bed and cleaning one's own room. No compensation need be provided for these tasks. *Wyatt v. Stickney, supra,* 344 F.Supp. at 381. *See generally Jobson v. Henne,* 355 F.2d 129 (2d Cir. 1966); *King v. Carey,* 405 F.Supp. 41 (W.D.N.Y.1975); *Downs v. Dept. of Public Welfare,* 368 F.Supp. 454 (E.D.Pa. 1973) (recognizing a distinction between personal housekeeping chores and other maintenance tasks).

■ 2) All work assignments must be made on an individual basis, and must be dictated by the patient's personal rehabilitation or training needs, and not solely by the institution's maintenance needs.

3) All work assignments must be an integrated part of the patient's treatment plan, and must be approved as a therapeutic activity by a Qualified Mental Health Professional [hereinafter cited as QMHP] responsible for the patient's treatment. *See Davis v. Watkins, supra,* 384 F.Supp. at 1203.

4) All work assignments must be supervised by a qualified staff member who is aware of the way the specific work assignment relates to the patient's individual treatment program.

5) All work performed for which the institution would otherwise have to pay an employee shall be compensated. The wage to be paid patients for performing work for which the institution would otherwise have to pay an employee shall be the amount a person in the community would receive for

performing the task, adjusted downward only if the patient's disability hinders his/her performance of the job. *See, e. g.,* 29 C.F.R. Pt. 529 (1977).

The above standards are grounded in the patient's right to treatment,[3] and therefore are applicable to civil as well as criminal committees. The purpose of a patient's confinement in LSH is the same irrespective of the nature of his commitment, *to wit*, the improvement of his mental condition and, when possible, reintegration into the community from which he came. The mental health profession recognizes no distinction between appropriate treatment modalities for the mentally ill based upon the nature of the commitment proceeding. *See* Report of Dr. Terry Brelje, Ph.D. Stip. Appendix G at 2. Indeed, Dr. Fox testified that certain work programs would be countertherapeutic for both civil and criminal committees. Moreover, expert witness Dr. Terry Brelje testified that it would generally be countertherapeutic to have a patient treated differently from those with whom he is living (Brelje Depo. at 190). This opinion was concurred in by expert witness Dr. Gerald Clark, M.D., who stated that "[i]t would be essential for maintaining therapeutic relationships with patients" that all patients feel that they are being treated on an equal basis (Clark Depo. at 32). Accordingly, the Court finds that the standards set forth above must be incorporated into any work program at LSH without regard to the patient's status as a civil or criminal committee.[4]

Finally, the Court must address an issue raised only obliquely by the plaintiffs, *viz.*, whether the defendants are constitutionally required to provide patients at LSH an opportunity to participate in a therapeutic, compensated work program consistent with the above standards, as an essential component of the right to treatment.

Standard VI of the Environmental Section of the Joint Commission Accreditation Manual for Psychiatric Facilities (1972) [hereinafter cited as JCAM], provides: "Productive work shall be provided for patients whenever possible." Based upon this standard, plaintiffs contend that defendants are constitutionally required to maintain a therapeutic, compensated work program, and cannot avoid meeting the standards set forth above by the expedient of eliminating all patient jobs at LSH.[5]

The task before the Court is to articulate the minimum constitutional rights which inure in the right to treatment. While the standards set by the Joint Commission on Accreditation of Hospitals [hereinafter cited as JCAH] must be accorded great weight as professional standards, they will not, in every instance, be found to be constitutional minimums.[6] The Court fully appreciates the value of therapeutic, compensated work programs. However, there is nothing in the record to compel the conclusion that absent such programs a patient will be denied "such individual treatment as will give [him] a realistic opportunity to be cured or to improve his or her mental condition." *Wyatt v. Stickney, supra*, 325 F.Supp. at 784. Various professionally recognized treatment modalities are reflected in the record, and the Court has no basis upon which to make a finding

---

3. *See Wyatt v. Stickney, supra*, 344 F.Supp. at 381; *see also* Friedman, "The Mentally Handicapped Citizen and Institutional Labor," 87 *Harv.L.Rev.* 567 (1974); Friedman, "Thirteenth Amendment and Statutory Rights Concerning Work in Mental Institutions" in 2 *Mental Health Law Project, Practicing Law Institute, Legal Rights of the Mentally Handicapped* 637 (B. Ennis & P. Friedman eds. 1973).

4. In so holding, the Court does not intend to suggest an opinion on the question whether involuntary participation by patients in work programs (compensated or otherwise) violates the Thirteenth Amendment. This issue has

been reserved for decision by the three-judge court.

5. *See generally* Perlin, "The Right to Voluntary, Compensated, Therapeutic Work as Part of the Right to Treatment: A New Theory in the Aftermath of Souder." 7 *Seton Hall L.Rev.* 298, 313–14 (1976).

6. As Judge Johnson noted in *Wyatt v. Stickney, supra*, this will undoubtedly afford patients something less than would be medically or socially desirable. 344 F.Supp. at 391–92.

that some or all of these are not suitable substitutes for the therapeutic value that might otherwise be gained through participation in a work program. Accordingly, the Court will not enjoin defendants to offer patients at LSH an opportunity to participate in a therapeutic, compensated work program, but rather will order only that to the extent a work program is operated, the standards set forth above must be adhered to.

*Issue Eight*: What is the proper role of security at LSH.

*Facts*:

LSH has been designated by the State of Ohio as a maximum security facility for the "criminally insane." The institution is surrounded by a 13' high wire fence, and seven armed guard towers.

The Security Department was organized as a separate entity at LSH in 1960, and at the time of trial the Security Staff consisted of eighty-four (84) persons. The Chief of Security, who is administratively responsible to the Superintendent of the Hospital, is charged with several responsibilities. His primary responsibility is to see that no one escapes (Stip. 140). In this regard, the guards armed with weapons in the towers are instructed to first shout a warning to patients attempting to escape, and then to fire at them if necessary to stop them (Tr. at 672–73). However, weapons have never actually been fired at LSH to halt an escapee (Tr. at 704). The Chief of Security also has responsibility for ensuring safe working conditions for employees, for investigating unusual incidents, for reporting health and safety violations, for transporting patients to and from other institutions, and for controlling local disturbances (Stip. 140; Larimore Depo. at 9–10).

The Security Staff operates the communication system at LSH, including the telephone switchboard, radio, and closed circuit television. Security also mans the gates which separate the dining area from lower security areas, and determines which patients may leave the higher security area to enter the lower security area.

In addition, the Security Staff performs other functions affecting patient treatment on a less regular basis. If a member of the nursing or professional staff has reason to believe a patient is in possession of contraband, the Security Staff will conduct a search.[7] Security also assists in the control, seclusion or restraint of patients when called upon to do so by an attendant or member of the professional staff. Mace is used to restrain a patient rather than physical contact, because it is believed to minimize the danger both to the patient and staff. Sodium bicarbonate, an antidote, is used when a patient must be maced. (Larimore Depo. at 80–84.) Security oversees the Executive Orders on seclusion and restraints, and other institution regulations. As discussed, *supra*, the Security Department participates on the Work Staff Committee, and also oversees the collection and distribution of incoming and outgoing mail. *See* p. 862, *infra*. The Security Department consults with physicians to recommend ward transfers for security reasons (Stip. 143), and on occasion has itself implemented emergency ward transfers, without prior authorization of a physician (Larimore Depo. at 34–35; Tr. at 708).

The Security Staff includes a "roving patrol" which was added to the original staff in 1972, subsequent to a criminal investigation by the State's Attorney General's office which resulted in the return of thirty-one (31) indictments, most of which involved incidents of patient abuse. The roving patrol visits each ward daily and investigates unusual incidents, including altercations between patients and between patients and an employee, theft, fire, and destruction of property (Stip. 144). The roving patrol reports violations of hospital rules to a QMHP (Tr. at 678), and refers the names of persons who have been accused of patient abuse to the Allen County Prosecutor (Larimore Depo. at 38).

---

7. Plaintiffs allege that the Security Staff conducts regular periodic searches of the wards, including the patients themselves. However, the record establishes that regular searches for contraband are conducted by the ward attendants (Tr. at 654–55).

For a person to qualify for the position of Psychiatric Criminology Attendant I on the Security Staff no police training is required (Stip. 149). Training for Security Officers at LSH is primarily on the job (Stip. 150). Because many members of the Security Staff have been hired from the attendant staff, most, but not all, have at least Psychiatric Aide I training (Larimore Depo. at 12–13; Tr. at 716). This involves a traineeship to the nursing personnel which includes a three-week program to develop interpersonal skills and awareness of employees' restraints, weaknesses and limitations, and a forensic aid course of eighty (80) hours which encompasses the medical terminology, recognition of common physical disorders, first aid, an introduction to normal personality development, common science of mental illness, and dealing with special behavior (See Deft.'s Exhibit 13). At the time of trial twenty-one (21) members of the Security Staff had participated in a two-week training seminar given by the Ohio Department of Corrections and Rehabilitation.

*Conclusions of Law*:

Plaintiffs assert that security considerations have become paramount to treatment considerations at LSH, and claim that the overwhelming and overriding presence of "security" in the institution is both antitherapeutic and dehumanizing, and therefore violates their constitutional rights to be held in the least restrictive confinement necessary for their continued treatment. Plaintiffs contend that the Security Department's role should be limited to providing peripheral security to prevent escapes, and request the Court to order that all internal security be delegated to the attendant staff under the supervision of QMPHs. Plaintiffs also seek an order requiring the Chief of Security to answer to the Clinical Director instead of the Superintendent, and have asked the Court to enjoin any rule or policy which requires or permits guards to shoot to kill potential escapees.

Defendants take the position that no constitutional deprivations have been demonstrated by the plaintiffs, and argue that in light of the state legislature's denomination of LSH as a maximum security institution, "its wisdom concerning security must control * * *." Defendants' Post-Trial Brief at 134.

Plaintiffs premise their claim that the security measures at LSH are so repressive as to be countertherapeutic and violative of their right to treatment in the least restrictive environment upon the testimony of three expert witnesses. This testimony may be briefly summarized as follows:

Drs. Walter Fox, M.D., and Gerald Clark, M.D., both expressed the view that LSH is operated primarily as a prison, and functions only secondarily as a hospital for treatment of the mentally ill (Fox Depo. at 91; Clark Depo. at 108). Dr. Terry Brelje, Ph.D., also expressed concern with the paramount concern for security evident among the nursing personnel (Brelje Depo. at 126). According to Dr. Brelje, who is Superintendent of a maximum security institution like LSH in Illinois, the maximum security environment at LSH, "by its very nature * * * reduces the normalization possible." (Brelje Depo. at 92.) Similarly, Dr. Clark testified that:

> In my observation the atmosphere and interrelations were negative and nontherapeutic rather than therapeutic at Lima State Hospital at the time of my visit in that the emphasis was placed on security, control, repression, restriction and overuse of tranquilizing medication.

(Clark Depo. at 75.)

In a similar vein, Dr. Fox testified that the great emphasis on security at LSH has an inhibiting effect on treatment. Dr. Fox testified that he was told many times by staff at LSH that they would have liked to have planned various activities for patients, but the Security Department had told them they could not. On this basis Dr. Fox concluded that therapy was interrupted by security considerations at LSH.

Defendants have presented no expert testimony to controvert the views of Drs. Brelje, Fox and Clark. Rather, defendants rest their position upon case authority which recognizes that:

Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institution against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody.

*Procunier v. Martinez,* 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). *See also Cruz v. Hauck,* 475 F.2d 475 (5th Cir. 1973), *appeal after remand,* 515 F.2d 322, *cert. denied sub nom., Andrade v. Hauck,* 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 332 (1976); *Vida v. Cage,* 385 F.2d 408 (6th Cir. 1967). Defendants contend that the security measures at LSH are necessary to fulfill the state's duty to prevent escape, and to ensure the safety and good health of patients confined therein. *See Smith v. Sullivan,* 553 F.2d 373 (5th Cir. 1977); *see also Grames v. Metzger,* Civ. No. 72–457 (N.D. Ohio W.D. filed January 7, 1977).

█ The Court fully recognizes that federal courts do not sit to supervise state institutions, the administration of which is of acute interest to the states. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). This policy of judicial restraint does not, however, encompass any failure by the states to take cognizance of valid constitutional claims. *Procunier v. Martinez, supra,* 416 U.S. 405–06, 94 S.Ct. 1800; *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977). And as is noted elsewhere in this *Opinion,* the state's mere invocation of the talisman "security" does not require the Court to stay its hand and thereby sanction the infringement of plaintiffs' cognizable constitutional rights.

█ In the Court's view, the testimony summarized above, considered against the background of the total record developed in this case, compels the conclusion that the security measures at LSH are so pervasive and oppressive as to infringe upon the plaintiffs' constitutional right to treatment in the least restrictive confinement. To be sure, not all infringements upon the constitutional rights of persons confined in state institutions are impermissible. As the Supreme Court stated in *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), " * * * there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." Though fully aware of the "dangerousness" of the patient population at LSH, and of the resulting need to take certain security precautions, the Court, on the record before it, finds that defendants have *not* accommodated, to the extent required by the Constitution, the plaintiffs' right to treatment in the least restrictive environment.

The Court does not, however, consider the full range of relief sought by plaintiffs to be either necessary or appropriate to reach a mutual accommodation of the security needs of the institution and the constitutional rights of the plaintiffs.

█ The Court finds no basis for *absolutely* enjoining the use of firearms to halt patients at LSH attempting to escape. Statutes and regulations permitting law enforcement officers to use force that might result in death in preventing the escape of persons they are attempting to arrest have consistently withstood constitutional challenge, provided the following constraints are imposed: 1) the officer must reasonably believe the person has committed a felony; 2) the officer must first notify the person that he intends to arrest him; and 3) the officer must reasonably believe that no means less than such force will prevent the escape. *See, e. g., Wiley v. Memphis Police Department,* 548 F.2d 1247 (6th Cir. 1977); *Wolfer v. Thaler,* 525 F.2d 977 (5th Cir.), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 800 (1976); *Jones v. Marshall,* 528 F.2d 132 (2d Cir. 1975); *Beech v. Melancon,*

465 F.2d 425 (6th Cir. 1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973); *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn.1971) (three-judge court). *Cf. Mattis v. Schnarr,* 547 F.2d 1007 (8th Cir. 1976), *rev'g,* 404 F.Supp. 643 (E.D. Mo.1975), *vacated sub nom., Ashcraft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). As one court has noted: "To abolish the use of deadly force altogether is to deprive the state and its citizens of their rights to security, safety and a feeling of protection." *Mattis v. Schnarr, supra,* 404 F.Supp. at 651, *quoted in Wiley v. Memphis Police Department, supra,* 548 F.2d at 1252.

 Escape and attempted escape from LSH may be a felony under Ohio law. *See* Ohio Revised Code § 2921.34. The Court cannot say with certainty that there will never arise a circumstance in which it would be reasonable for a LSH guard to conclude, after proper warning, that no means less than deadly force will prevent such escape. Therefore, the Court will not absolutely enjoin the use of firearms by guards at LSH to halt patients attempting to escape. The Court does, however, find defendants' policy regarding the use of firearms to be constitutionally deficient in that it does not inform the guards that firearms may be used only in circumstances where it is reasonable to believe that no means less than deadly force will prevent escape. The Court will therefore require defendants to promulgate written regulations consistent with this *Opinion* regarding the use of firearms by guards in the guard towers.

 Plaintiffs have also requested the Court to Order that all internal security functions at LSH be taken away from the Security Department and turned over to the attendant staff. The Court, however, shares Dr. Brelje's view that the problem lies not with the existence of a Security Staff, or what it does, but rather with the total concept of security at LSH, and "how it gets affected by the nursing attendants." (Brelje Depo. at 126.) As the United States notes, what is needed at LSH is a change in attitude, and the Court does not believe this

objective will be measurably furthered by relegating the Security Staff to the performance of peripheral security functions.

 In his deposition testimony, Dr. Brelje offered two specific suggestions for altering the repressive concept of security which exists at LSH. First, the Doctor suggested that the Security Chief report to the Clinical Director of the Hospital rather than to the Superintendent. (Brelje Depo. at 125.) In addition, he suggested that the placement of an increased number of professional staff in the units would have a significant impact on the problem (Brelje Depo. at 126–27). The Court considers both suggestions to be wholly reasonable methods of achieving a more therapeutic atmosphere at LSH without compromising the state's legitimate interest in maintaining an orderly and secure environment. Certainly it is well within the authority of this Court to Order both an increase in staff and a realignment of staff when necessary to redress a constitutional deprivation. *See Smith v. Sullivan, supra,* 553 F.2d at 380; *Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972); *Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972), *aff'd sub nom., Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974).

 For the reasons stated above, defendants are hereby Ordered to forthwith alter the administrative structure at LSH in such a way that the Chief of Security shall be directly responsible to the Hospital's Clinical Director for the performance of all duties assigned to the Security Department which affect patient treatment.

Defendants are further Ordered to promulgate written regulations consistent with this *Opinion* regarding the use of firearms to prevent escapes.

Defendants shall inform the Court when the above Orders have been complied with.

*Issue Thirteen*: Whether the Fourteenth Amendment requires legal representation of LSH patients at "staffings" or any similar procedure(s) which may be substituted in the future.

*Facts*:

"Staffing" is a procedure whereby a patient is reviewed by the staff members as-

signed to him to determine the disposition of observation and indefinite commitment cases. Each patient is entitled by statute to a yearly routine staffing, and additionally, at any time upon the recommendation of a physician, and prior to making recommendations to a court. (Stip. 277; Depo. of James W. Seitz at 155.) Certain Executive Orders of the Ohio Department of Mental Health and Mental Retardation afford patients more frequent staffings. See Executive Orders G-19 to G-23, issued August 23, 1974.

The staff members attending the staffing include the physician, the social worker and the psychologist assigned to the patient. The staffing is presided over by a psychiatrist who may or may not be on fulltime status at LSH, and who may or may not have previously examined the patient being staffed. The decision of the presiding psychiatrist is determinative, subject to the review of the Superintendent (Stip. 278).

The average staffing takes approximately twenty (20) minutes. A patient's records are reviewed, and the patient is asked some very general questions such as, "Are you sleeping, eating and treated all right?" "Are you mentally sick, crazy or insane?" "Do you need help?" (Stip. 279.) In most cases, the patient's case is discussed after he leaves the room, and disposition is then made by the staffing physician. A patient is not permitted to have counsel or a counsel substitute present during his staffing (Stip. 277).

The recommendations of the Lima State Staff which are forwarded to the courts concerning patients are made under the supervision of the Superintendent, who signs every letter or recommendation (Stip. 280). With respect to persons committed to LSH for observation pursuant to Ohio Revised Code § 2947.25, see page 6, supra, a written report from the institution must be submitted to the court, and a copy must be served upon the patient's attorney. A hearing is then required, at which counsel may confront and cross-examine the examiners making the report, and may produce witnesses, lay and expert, on the patient's mental condition. Upon consideration of the report, and such other evidence as is submitted, the court must then determine whether the patient is either a mentally ill, mentally retarded, or psychopathic offender, as defined by Ohio Revised Code §§ 5122.01, 5122.15, and 2947.24, respectively. See Ohio Revised Code § 2947.25. The reports of the examining physicians in cases in which insanity has been set up as a defense, or in which the present insanity of the accused may be under investigation by the court, are likewise subject to review by defense counsel, and the examining physician is likewise subject to examination and cross-examination. See Ohio Revised Code § 2945.40.

In contrast, the staffing reports of those persons indefinitely committed pursuant to Ohio Revised Code §§ 2947.25 (mentally ill, mentally retarded, psychopathic offenders), 2945.37 (incompetent to stand trial), 2945.39 (not guilty by reason of insanity), 2967.22 (mentally ill parolees), 5125.03 (civil transferees), and 5125.05 (criminal transferees), are not subject to automatic judicial review. Pursuant to Ohio Revised Code §§ 2945.39 and 2947.271, persons committed by reason of having been found not guilty by reason of insanity, or by reason of having been adjudged a mentally ill, mentally retarded, or psychopathic offender, are afforded an annual review of their case by the Superintendent,[8] but are only afforded a judicial hearing, replete with the right to counsel

---

8. Under Ohio Revised Code § 2947.271, after the Superintendent has made three consecutive annual determinations that a patient is not sufficiently improved to the extent that he no longer needs the special custody, care or treatment of the institution, such patient is entitled, upon written request, to have his case reviewed by a panel of three physicians not connected with the institution of which he is an inmate. If the panel concludes that the person is suffi-

ciently improved to justify such action, it must certify its report to the court which tried the person. Ohio Department of Mental Health and Mental Retardation Executive Order No. G-23, effective August 23, 1974, provides for review by a panel of three physicians within approximately a year and a half of commitment, and further provides for certification to the committing court for appropriate action after two panel reviews.

and to confront and cross-examine expert and lay witnesses, if the Superintendent determines (presumably on the basis of the staffing report) that a hearing should be held. *See* Ohio Revised Code §§ 2945.39 and 2947.27. Similarly, the staffing reports pertaining to mentally ill parolees and penal transferees are not judicially reviewed until the expiration of the maximum term of the transferee's sentence. *See* Executive Order No. G–23, *supra ; see also* Executive Order No. G–21. Civil transferees are afforded only administrative review of institution decisions based upon their periodic staffings. *See* Executive Order No. G–20, *supra.*

*Conclusions of Law :*

Plaintiffs assert that all patients at LSH have a constitutional right grounded in the Due Process Clause of the Fourteenth Amendment to have counsel present *at that portion of the staffing in which the patient participates.* Plaintiffs contend that representation by counsel at staffings engenders a feeling by the patient that he has been treated in an equitable manner, and is therefore therapeutic. They further contend that counsel's presence will enhance the accuracy of the fact finding process upon which psychiatric diagnoses are made, and emphasize the absence of regular judicial review of staff findings that a patient is in continual need of hospitalization at LSH in cases other than those of observation committees.

*Amicus* take a somewhat different position, asserting that while it is desirable to permit counsel at all staffings, it is only constitutionally mandated that counsel be permitted at staffings which are part of the commitment procedures.[9] *Amicus* rely upon those cases which have held that mental patients and mentally ill offenders are entitled, under the Fourteenth Amendment, to assistance of counsel at all meaningful stages of the commitment procedure. *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct.

1209, 18 L.Ed.2d 326 (1967); *Heryford v. Parker,* 396 F.2d 393 (10th Cir. 1967); *In re Fisher,* 39 Ohio St.2d 71, 313 N.E.2d 851 (1974). *Amicus* argue that because the staffing report may constitute, alone or with other evidence, the basis for commitment, staffings are a significant step in the commitment process to which the right to counsel attaches.

Defendants, on the other hand, take the position, that plaintiffs' claim of a constitutional right to have counsel present at staffings finds no basis in either the Fifth, Sixth or Fourteenth Amendments. Defendants contend that the staffing is an essentially *medical* decision making process, and is not, and should not be, adversarial in nature. Defendants further assert that the balancing test enunciated by the Supreme Court in *Wolff v. McDonnell, supra,* requires a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution", 418 U.S. at 556, 94 S.Ct. at 2975, and that such an accommodation in this case does not compel a constitutionally mandated right to counsel at any staffing.

Regrettably, there is only limited authority to guide the Court in the resolution of this issue, and none of it is precisely on point.

Several courts have addressed the question whether a *pretrial* mental examination of an accused who has interposed the defense of insanity, or whose competence to stand trial is in question, is a "critical stage" of the criminal proceeding at which the right to counsel secured by the Sixth Amendment attaches. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The clear majority rule on this issue holds that such a pretrial examination is *not* a critical stage within the meaning of *Wade,* and that there therefore exists no constitutional right to have counsel present at such examinations. *See generally Hollis v. Smith,* 571 F.2d 685, 691–92 (2d Cir. 1978); *United States v. Co-*

---

**9.** *Amicus* appear to assert a right to counsel at the deliberative stage of the staffing as well as at the portion in which the patient participates.

*See* United States' Post-Trial Memorandum at 119.

hen, 530 F.2d 43 (5th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *Gomes v. Gaughan*, 471 F.2d 794 (1st Cir. 1973); *United States v. Baird*, 414 F.2d 700 (2d Cir. 1969), *cert. denied*, 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970); *United States v. Albright*, 388 F.2d 719 (4th Cir. 1968); *United States ex rel. Wax v. Pate*, 298 F.Supp. 164 (N.D.Ill.1967), *aff'd*, 409 F.2d 498 (7th Cir.), *cert. denied*, 396 U.S. 830, 90 S.Ct. 83, 24 L.Ed.2d 81 (1969); *People v. Larsen*, 47 Ill.App.3d 9, 5 Ill.Dec. 390, 361 N.E.2d 713 (1977); *People v. Martin*, 386 Mich. 407, 192 N.W.2d 215 (1971), *cert. denied*, 408 U.S. 929, 92 S.Ct. 2505, 33 L.Ed.2d 342 (1972). *Cf. Thornton v. Corcoran*, 132 U.S.App.D.C. 232, 407 F.2d 695 (1969). *See also United States v. Fletcher*, 329 F.Supp. 160 (D.D.C.1971) (holding that accused has no constitutional right to have counsel at pretrial staffing).[10] Similarly, it has been held that the due process clause does not require that persons in civil commitment proceedings be afforded the right to assistance of counsel at pre-hearing psychiatric interviews. *Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D.Wis. 1972), *vacated and remanded on other grounds*, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975).

The decisions in the cases cited above have generally been premised upon two factors. First, the courts have, almost unanimously, adopted the position that the pre-hearing examination is for the purpose of providing the physician with a basis for rendering a decision as to the person's mental state, and that the presence of a third party in a legal, non-medical capacity would undermine the physician/patient relationship and limit the efficacy of the examination. *See, e. g., United States v. Cohen, supra; Tippett v. State of Maryland*, 436 F.2d 1153 (4th Cir. 1971); *United States v. Baird, supra* ; *United States v. Albright, supra.* Second, the courts have concluded

that the dangers inherent in the identification cases which gave rise to the Supreme Court's ruling in *Wade* are not present in pretrial psychiatric examinations. Specifically, it has been held that the dangers of overreaching which are inherently present in pretrial identifications are inherently *lacking* at pretrial psychiatric observations. *See United States ex rel. Wax v. Pate, supra*, 298 F.Supp. at 169. Accordingly, the courts have concluded that the integrity of the fact finding process is adequately protected by counsel's access to the psychiatric reports, and by the person's right, through counsel, to confront and cross-examine the examining psychiatrist at the subsequent hearing, and that the absence of counsel at psychiatric examinations therefore does not derogate from the person's right to a fair trial or hearing. *See, e. g., Gomes v. Gaughan, supra* ; *United States v. Albright, supra* ; *United States ex rel. Wax v. Pate, supra.*

It appears to the Court that, at least as regards those staffings of observation committees at LSH which are conducted to provide a basis for subsequent judicial commitment decisions, the factors which were relied upon in the cases cited above are both operative and controlling in the instant case.

In the case *sub judice*, two experts have expressed their professional opinions that the presence of a patient representative at staffing, independent of the medical staff, would have an adverse effect upon the staffing procedure by making free communication among the staff difficult, and by tending to "change the nature of the relationship between the staff and the patient into one of an adversary nature rather than one of mutual cooperation and working together." (Depo. of Dr. Gerald Clark, M.D., at 113. *See also* Testimony of Dr. Kenneth Gaver, M.D., Tr. at 561–62).[11] In

---

10. *Contrast Lee v. County Court of Erie Co.*, 27 N.Y.2d 432, 318 N.Y.S.2d 705, 267 N.E.2d 452 (Ct.App.1971) (holding that an accused has a right to have counsel present at pretrial psychiatric examinations in order to make more effective his basic right of cross-examination).

11. In contrast, Dr. Walter Fox, M.D., expressed the view that there would be no medical or therapeutic problem with having a lay representative, or counsel, at staffing. (Depo. of Dr. Walter Fox, M.D., at 30.) However, Dr. Fox was of the view that the patient should not be

light of this testimony, the court cannot dismiss lightly the defendants' claim that the presence of counsel, or a counsel substitute, would limit the efficacy of the staffing procedure. Moreover, there is nothing whatsoever in the record to suggest that the absence of counsel at staffings has in any way prejudiced a patient's right to full and effective cross-examination of the examining physician at the subsequent judicial commitment hearing. Therefore, the Court will follow the majority rule adopted in the pretrial psychiatric examination cases, *supra*, and hereby holds that the staffing of observation committees, subject to automatic judicial review, is not a "critical stage" in the commitment process to which the right to counsel attaches.

As noted above, staffings are also regularly scheduled for the review of patients indefinitely committed to LSH, in order to determine whether continued confinement at LSH is necessary. Unlike the staffings of observation committees, discussed *supra*, such staffings are not automatically subject to judicial review at a hearing affording full due process safeguards. Therefore, it remains for the Court to consider plaintiffs' contention that the absence of automatic judicial review requires that counsel be permitted at such staffings to assure the fairness and accuracy of the fact finding process.

Plaintiffs have cited no authority in support of their position that counsel is constitutionally required at such staffings, and the Court can find none. The Court recognizes that, for indefinite committees, staffing offers the only immediate avenue to release from LSH.[12] Nonetheless, the staffing remains essentially a *medical* decision making process, and the institution's

concern that the presence of third persons in a non-medical capacity would limit the effectiveness of the process is equally valid with respect to such staffings. As defendants note, *Wolff v. McDonnell, supra,* instructs that in determining the minimum due process safeguards to be afforded, the Court must reach an accommodation between the institutional objectives and the provisions of the constitution. 418 U.S. at 560, 94 S.Ct. 2963. In the instant case, the Court must balance the state's interest in maintaining the effectiveness of the staffing process against the patient's interest in being free from arbitrary decision making. *See Wolff v. McDonnell, supra,* 418 U.S. at 556–58, 94 S.Ct. 2963.

■ Based upon the testimony of Drs. Gaver and Clark, the Court must conclude that the efficacy of the staffing process, at least in certain instances, could be seriously undermined by the presence of counsel. On the other hand, the Court finds little reason to believe that the presence of counsel at staffings would enhance the accuracy of the fact finding process, or diminish the likelihood of arbitrary decision making. While plaintiffs urge that the staffings present "complex issues", and therefore fall within the exception noted by the Supreme Court in *Wolff v. McDonnell, supra,* 418 U.S. at 570, 94 S.Ct. 2963, the record demonstrates that the complex issues are medical ones, and not factual. The factual questions asked of patients at the staffings are quite elementary, *see* Stip. 279, and require the patient to have knowledge only of his own well-being. The Court cannot conceive of any proper objections which counsel might interpose to such questions, and certainly the purpose of the staffing would be undermined if counsel were to undertake to an-

---

present at staffing, whereas plaintiffs assert the position that counsel is required *only* at the portion of the staffing which is participated in by the patient.

12. Department of Mental Health and Mental Retardation Executive Order No. G–23 does provide that after successive review panels have determined that a patient committed under Ohio Revised Code § 2947.25, has not recovered, the panel report shall be certified to

the committing court. In addition, the writ of habeas corpus is available in Ohio to persons committed under Ohio Revised Code §§ 2945.38 and 2945.39. *See* Ohio Revised Code §§ 2725.-01 and 2945.39. *See also State ex rel. Townsend v. Bushong,* 146 Ohio St. 271, 65 N.E.2d 407 (1946). Insofar as the staffings of indefinite committees are subject to judicial review through these mechanisms, the analysis at p. 850, *supra,* is applicable.

swer for the patient, or to explain either questions or answers. The medical decisions reached at the staffings are, of course, complex, but plaintiffs concede that participation by counsel in these decisions would not be proper. Thus, the benefit to be gained by the presence of counsel at staffings appears to be quite minimal. Weighing such benefit against the probable detriment to the process which could result from the interjection of counsel, the Court finds that due process does not require that counsel be permitted at the staffings of indefinite committees at LSH.

In summary, the Court finds that the Fourteenth Amendment does *not* require legal representation of LSH patients at "staffings" or any similar procedure(s) which may be substituted in the future.

*Issue Fifteen* : Whether limitations on mail privileges in LSH are violative of the Fourteenth Amendment.

*Facts* :

The following practices regarding inmate correspondence were in effect at LSH at the time of trial, and are challenged by plaintiffs and *Amicus* as being violative of patients' rights under the First and Fourteenth Amendments.

### Incoming Mail

1) First class incoming mail is opened in the business office and inspected for contraband and money. Patients are not present when their mail is opened. Incoming mail is neither read nor censored by the business office (Tr. at 659, 661; Stip. 147; Depo. of Thomas Larimore at 187).[13]

2) Incoming packages are opened in the mailroom, where the contents are itemized, and receipts sent to both the receiver and sender (Depo. of Thomas Larimore at 188; *see also Amicus* Exhibit 1, Subpart B.) Patients are not present when their packages are opened.

3) Periodicals and books may only be received by patients if they have been mailed directly from the publisher (Stip. 147; Depo. of Thomas Larimore at 66).

### Outgoing Mail

4) Patients are permitted to seal all outgoing letters except those addressed to business concerns (Tr. at 563–64; Depo. of Thomas Larimore at 56). Letters addressed to business concerns are checked by the patient's unit team to insure that the patient has sufficient funds to pay for the purchase (Depo. of Thomas Larimore at 65; Tr. at 664). Business letters which are not permitted to go out are returned to the patient.

5) If a recipient of a letter from a patient complains to the Hospital that he/she does not wish to receive further correspondence from the patient involved, or that he/she has received obscene mail from the patient, the Security Department may request the Superintendent to order the Security Department to censor the patient's outgoing mail (Tr. at 665). Censored mail is either returned to the patient, or placed in patient's file (Depo. of Thomas Larimore at 110). As noted below, no clear guidelines exist for the censorship of mail.

6) Correspondence addressed to "strange people", such as the Pope or the Queen of England, is not mailed (Tr. at 688–89). Such mail is either returned to the patient or placed in the patient's file.

---

13. In their statement of the facts, plaintiffs assert that all incoming mail at LSH, including that from other state penal and psychiatric institutions, is read and censored for content by the Security Department. Plaintiffs' Post-Trial Brief at 83. This assertion is supported by Stipulation 147, and in part by Executive Order No. 55, Stip. Appendix B § 11, B, 2. However, in his deposition, taken August 1, 1974 (four months after the Stipulations were filed), Thomas Larimore, Chief of Security, testified that "[t]he only mail that is censored here is the mail between patient-to-patient within this institution which is censored by this office." Depo. of Thomas Larimore at 108. Defendants assure the Court that Mr. Larimore's testimony is an accurate statement of the practices at LSH, Defendants' Post-Trial Brief at 201. Moreover, defendants concede that it would be constitutionally impermissible to read and censor incoming general correspondence. Defendants' Post-Trial Brief at 201–02.

### Intra-Hospital Mail

7) Intra-institution patient-to-patient mail is censored by the Security Department for clarity of contents and appropriateness (Depo. of Thomas Larimore at 111), and to prevent escape or riot plans (Tr. at 690).

8) No comprehensive written guidelines with respect to the censorship of mail exist. Letters may be censored if "obnoxious to the degree that they're insulting to the other person or * * * a threat on the security of the hospital * * *" (Depo. of Thomas Larimore at 108), or if they include " * * * threats (implied or clearly stated), abusive language, obscenities or other matters as may be deemed inappropriate * * *" (Stip. Appendix B, (II)(A)(7).

### Conclusions of Law:

Plaintiffs and *Amicus* contend that the foregoing practices violate the First and Fourteenth Amendment rights of the patients at LSH by imposing greater limitations upon First Amendment freedoms than are necessary for the protection of the state's recognized interests in security, order and rehabilitation. Defendants, on the other hand, call the Court's attention to the fact that LSH "performs a security function identical to that performed by purely penal institutions in the State of Ohio" (Defendants' Post-Trial Brief at 195), and urge that if the standards applicable to prison cases are applied, the procedures outlined above clearly meet constitutional muster.

In *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court articulated the standard to be applied in determining whether policies and practices relating to the regulation of prison inmate correspondence constitute an impermissible restraint on First Amendment liberties:

First, the regulation or practice in question must further an important or substantial government interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus, a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more legitimate governmental interests identified above.

416 U.S. at 413, 94 S.Ct. at 1811 (footnotes omitted).

While defendants urge the Court to apply this standard in testing the constitutional validity of the mail practices at issue herein, plaintiffs assert that the practices, at least insofar as they are applied to patients who have not been criminally convicted, must be subjected to more rigorous scrutiny. Plaintiffs rely on that line of cases which has recognized that pretrial detainees do not stand on the same footing as convicted inmates, and therefore may not be subjected to any greater restrictions than those which inhere in confinement itself, or which are justified by compelling necessities of jail administration. *See Duran v. Elrod,* 542 F.2d 998 (7th Cir. 1976); *Inmates of San Diego Jail v. Duffy,* 528 F.2d 954 (9th Cir. 1975); *Rhem v. Malcolm,* 507 F.2d 333 (2d Cir. 1974); *Dillard v. Pitchess,* 399 F.Supp. 1225 (S.D.Cal.1975); *Jones v. Wittenberg,* 330 F.Supp. 707 (N.D.Ohio 1971), *aff'd,* 456 F.2d 854 (6th Cir. 1972).

▮ The Court is in full accord with the general notion that pretrial detainees may suffer fewer privations than convicted inmates. Where, however, the sole interest advanced in support of an institutional restriction is *security*, the reasons which otherwise require differences in treatment between categories of inmates are not present. *See Taylor v. Sterrett*, 532 F.2d 462, 470 n. 11 (5th Cir. 1976). Restrictions which are shown to be necessary to further the governmental interest in maintaining custody, maintaining security, and maintaining internal order and discipline are constitutionally permissible even as applied to detainees, notwithstanding the fact that such restrictions may be viewed as having a punitive effect. "A pretrial detainee constitutionally need not, and, as a practical matter, cannot be provided with a normal civilian life." *Padgett v. Stein*, 406 F.Supp. 287 (M.D.Pa.1975).

▮ The patients at LSH have been involuntarily committed to the custody of the state. Moreover, most, if not all, patients at LSH have demonstrated violent or dangerous behavior to warrant their confinement there. Security is, as noted above, a legitimate concern of the institution, and the Court therefore considers the *Procunier* standard wholly applicable to the instant case. *Accord Smith v. Shimp*, 562 F.2d 423 (7th Cir. 1977); *Taylor v. Sterrett, supra; Padgett v. Stein, supra; Giampetruzzi v. Malcolm*, 406 F.Supp. 836 (S.D.N.Y.1975). *Contrast Inmates of San Diego Jail v. Duffy, supra; Dillard v. Pitchess, supra.*

### Incoming General Correspondence

Plaintiffs object first to the practice of opening and inspecting all incoming non-privileged mail. Defendants assert that it is necessary to open and inspect all non-privileged mail to insure that contraband does not enter the institution. Plaintiffs counter this argument by asserting that defendants' interest in keeping contraband out of the institution can be achieved by less intrusive means, *to wit*: use of a fluoroscope, or manual manipulation.

▮ The overwhelming majority of the courts which have addressed this issue have concluded that when the minimal intrusion resulting from mere *inspection* of the contents of an inmate's mail is weighed against the state's interest in keeping contraband out of the institution, the state's interest in security prevails. Indeed, in *Wolff v. McDonnell, supra*, 418 U.S. at 574–77, 94 S.Ct. 2963, the Supreme Court expressly *rejected* the contention that legal mail could not be opened and inspected. It is clear, therefore, that general correspondence may be opened and inspected to screen out contraband. *Accord Smith v. Shimp, supra; Guajardo v. Estelle*, 432 F.Supp. 1373 (S.D.Tex.1977); *United States ex rel. Wolfish v. United States*, 428 F.Supp. 333 (S.D.N.Y.1977); *Padgett v. Stein, supra; Gates v. Collier*, 390 F.Supp. 482 (N.D.Miss.1975), *aff'd*, 525 F.2d 965 (5th Cir. 1976); *Preston v. Cowan*, 369 F.Supp. 14 (W.D.Ky.1973), *aff'd in relevant part sub nom., Ault v. Holmes*, 506 F.2d 288 (6th Cir. 1974).

Plaintiffs further contend that if incoming mail is to be opened and inspected for contraband, it must be opened in the patient's presence. In their Post-Trial Brief, defendants seek to justify their practice of opening non-privileged mail outside of the patient's presence by noting the testimony of Thomas Larimore, Chief of Security, to the effect that having patients in the business office while mail is opened would pose a security risk because the office is outside the general population area. Defendants also note Mr. Larimore's testimony that taking mail to the wards to be opened likewise poses security problems because then the contraband will already be on the ward. In addition, defendants direct the Court's attention to Mr. Larimore's testimony to the effect that opening mail in the patient's presence will involve "administrative inconvenience." (Larimore Depo. at 61–63.)

▮ Under *Procunier*, the burden is upon the government to demonstrate that restrictions imposed upon inmates' First

Amendment rights [14] are in furtherance of a substantial interest of institutional administration, and are no greater than is essential to further that interest. 416 U.S. at 413–14, 94 S.Ct. 1800. While considerations similar to those advanced by defendants herein have been deemed sufficient justification for the opening of mail outside the inmate's presence by other courts concerned with other institutions, *see, e. g., Smith v. Shimp, supra; United States ex rel. Wolfish v. United States, supra; Stover v. Carlson,* 413 F.Supp. 718 (D.Conn.1976); *Gates v. Collier, supra,* the Court is not satisfied that the heavy burden imposed upon the government by *Procunier* has been satisfied in this case. The presence of the patient when his mail is opened is the only effective means known to this Court to insure that such mail is not read,[15] which the defendants concede would be constitutionally impermissible (Defendants' Post-Trial Brief at 201–02). In the Court's view, the opening of mail in the patient's presence poses only an administrative problem for the institution, and not a true security problem. Indeed, it appears that since May of 1976, patients at LSH have been permitted to open their own mail under the supervision of mail personnel. *See* Special Master's Report to Court (filed January 21, 1977). The Court has not been advised of any resulting breaches of security, *contrast Gates v. Collier, supra,* 390 F.Supp. at 484 n. 2, and therefore holds that defendants' invocation of "security" cannot prevail on this point. It is the opinion of the Court that the opening of mail at LSH outside the presence of the patient to inspect for contraband is constitutionally impermissible. *Accord Preston v. Cowan, supra. See also Hardwick v. Ault,* 447 F.Supp. 116, 130 (M.D.Ga.1978).

*Publications*

Plaintiffs also challenge the practice which permits them to receive magazines and books *only* if they are sent by the publisher. Plaintiffs claim that this regulation not only infringes upon patients' First Amendment rights, but also impedes their rehabilitation process by increasing the cost of securing reading material which will make easier their adjustment to the "real world."

Defendants contend that the "publisher only" rule is necessary to prevent "drugs, namely hallucinogens, acid—[from] coming in on books, magazines by prearrangement * * * which would be impossible to detect." (Larimore Depo. at 66–67.)

While recognizing that the entry of hallucinogens into LSH would pose a security problem and might also impede the rehabilitation process, the Court does not find defendants' "publisher only" rule sufficiently related to the advancement of security to justify the restraint thereby imposed on the patients' access to published materials. There is no evidence in the record of a history of drug smuggling at LSH. Nor is there any evidence that defendants have attempted less restrictive measures. On the present record, the security concerns advanced by the defendants are largely speculative, and therefore are deemed by the Court to be insufficient under *Procunier* to justify the subject regulation. *Accord United States ex rel. Wolfish v. United States, supra,* 428 F.Supp. at 340–41; *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.), *modified and remanded on other grounds,* 507 F.2d 333 (2d Cir. 1974); *Inmates of*

**14.** While the Supreme Court in *Procunier* rested its decision upon the First Amendment rights of the general public with whom prisoners correspond, and therefore did not decide the question whether prisoners retain their First Amendment right to freedom of expression, the free speech rights of both pretrial detainees and convicted prisoners have been consistently recognized by the courts. *See, e. g., Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Woods v. Daggett,* 541 F.2d 237 (10th Cir. 1976); *Taylor v. Ster-*

rett, 532 F.2d 462, 478–80 (5th Cir. 1976); *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); *Cofone v. Manson,* 409 F.Supp. 1033 (D.Conn.1976); *Stone v. Schmidt,* 398 F.Supp. 768 (W.D.Wis.1975).

**15.** *See generally Taylor v. Sterrett,* 532 F.2d 462 (5th Cir. 1976). *Cf. Smith v. Shimp,* 562 F.2d 423, 427 (7th Cir. 1977); *Crowe v. Leeke,* 550 F.2d 184 (4th Cir. 1977).

*Milwaukee County Jail v. Peterson*, 353 F.Supp. 1157, 1168–69 (E.D.Wis.1973). *See also Cruz v. Hauck*, 515 F.2d 322 (5th Cir. 1975) (regulation which permitted inmates of county jail to receive only legal materials supplied by publisher or attorney held unconstitutional).[16]

### Intra-Hospital Correspondence

Plaintiffs challenge defendants' practice of reading and censoring all correspondence *between* patients at LSH. Plaintiffs challenge both the fact that such mail is read, and the standard used for censorship. Defendants insist that reading such mail is essential to detect escape plans and other schemes which might lead to institutional disturbances. Plaintiffs counter this argument by noting that patients in the same ward are permitted to engage in private conversations with one another, and that such conversations, although posing the same security risks, are not monitored.

The plaintiffs have cited no authority in support of the proposition that the reading of intra-hospital correspondence *per se* is constitutionally impermissible, and, after diligent research, the Court can find none. Those courts which have reviewed the constitutionality of similar regulations as applied to inter-prison correspondence have uniformly concluded that censorship of such mail furthers the institution's interest in maintaining order and preventing escape, and that the practice is no broader than

16. *Woods v. Daggett*, 541 F.2d 237 (10th Cir. 1976), which upheld a "publisher only" rule similar to that at issue herein, is distinguishable on its facts from the instant case. In *Woods*, the state brought forward evidence establishing a history of "bizarre efforts to carry contraband", including cards which were found to contain "hacksaw blades and drugs concealed within * * * thick paper * * *." 541 F.2d at 240. Such a record does not exist in this case.

17. The Court would certainly take issue with the district court's suggestion in *Lawrence v. Davis, supra*, 401 F.Supp. at 1205, that inter-institutional correspondence between convicted inmates is totally unprotected. *See Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

necessary to protect a substantial government interest. *Peterson v. Davis*, 415 F.Supp. 198 (E.D.Va.1976); *Mitchell v. Carlson*, 404 F.Supp. 1220 (D.Kan.1975); *Williams v. Ward*, 404 F.Supp. 170 (S.D.N.Y. 1975); *Lawrence v. Davis*, 401 F.Supp. 1203 (W.D.Va.1975). *See also Vida v. Cage*, 385 F.2d 408 (6th Cir. 1967).

While not in full agreement with the result reached in each of the cases cited above,[17] the Court is convinced that totally unrestricted correspondence between patients at LSH is not constitutionally compelled. The spectre of a well orchestrated, institution-wide disturbance at LSH is sufficiently threatening to justify some intrusion upon the First Amendment rights of the patients confined therein.[18] It seems clear to the Court, however, that the present practice of reading *all* intra-hospital correspondence is more onerous than necessary to protect the security interest of the institution. A procedure whereby intra-hospital mail is randomly spot-checked, *compare Smith v. Shimp, supra*, supplemented by a procedure whereby approval may be secured, upon a showing of probable cause, for the regular reading of the intra-hospital mail of a particular patient, would, in the view of the Court, adequately protect the state's interest, and likewise satisfy *Procunier's* mandate that regulations be no more restrictive of patients' rights than necessary.[19]

18. Defendants' alleged concern over the dissemination of escape plans is only partially dissipated by their concession that patients are free to converse privately with other patients on their ward. *Compare United States ex rel. Wolfish v. United States, supra*, 428 F.Supp. at 343, *with Smith v. Shimp, supra*, 562 F.2d at 426 n. 2, and *Feeley v. Sampson*, 570 F.2d 364, 374 (1st Cir. 1978). Certainly the danger posed by a disturbance confined to a single ward is less than that posed by a multi-unit or institution-wide disturbance.

19. Of course, when mail is withheld or censored, the institution must afford appropriate notice to the patient, and must provide the patient a reasonable opportunity to challenge the initial determination before a disinterested person not privy to the initial censorship determination. *Hopkins v. Collins*, 548 F.2d 503

For the reasons set forth above, the Court concludes that the defendants' practice of reading *all* intra-hospital mail on a regular basis is constitutionally impermissible.

Having determined that it is proper, in some instances, for defendants to read and censor intra-hospital mail, it remains for the Court to determine whether the censorship guidelines used by defendants pass constitutional muster.

■ There can be no question but that defendants' standards for censoring intra-hospital mail are both impermissibly vague and overbroad. No comprehensive written guidelines exist. Thomas Larimore, Chief of Security, testified that:

> the guidelines are verbal guidelines. If the letters are obnoxious to the degree that they're insulting to the other person or are a threat to the security of the hospital, such as "We're going to break out tonight. Do you want to join us." Or something along those lines, they're referred to the doctor.

(Larimore Depo. at 108.) It is stipulated that intra-hospital mail is also censored if it includes "threats * * * abusive language, obscenities or other matters as may be deemed inappropriate." There apparently exist no common definitions of the term "abusive", "obscene" or "obnoxious", and the Court must therefore assume that individual reviewing officers supply their own views as standards for rejecting correspondence.

Censorship of inmate correspondence pursuant to similarly wide-ranging and loosely-defined standards has been consistently invalidated by the courts on the grounds of both vagueness and overbreadth. *See, e. g., Procunier v. Martinez, supra,* 416 U.S. at 415–16, 94 S.Ct. 1800 (censorship of statements, that, *inter alia,* unduly complain, are deemed defamatory, or otherwise inappro-

priate); *Guarjardo v. Estelle, supra,* 432 F.Supp. at 1383–84 (invalidating regulations which permitted the rejection of any letter which "concerns plans for activities in violation of institution rules", or which contains "a graphic presentation of sexual behavior that is in violation of the law"); *Hopkins v. Collins,* 411 F.Supp. 831, 832–34 (D.Md.1976), *aff'd in relevant part,* 548 F.2d 503 (4th Cir. 1977) (invalidating regulations which permitted the rejection of mail in the following categories: 1) Inflammatory or advocates escape, violence, disorder, or assault; 2) Directly or indirectly threatens the security, safety or order of the institution or its personnel).[20] Consistent with this authority, the Court concludes that the guidelines presently used to censor intra-hospital mail at LSH provide insufficient guidance to institution officials and patients, and are therefore impermissibly vague. The Court further concludes that the record fails to establish that such broad restrictions, reaching "abusive", "obnoxious" and "inappropriate" conduct, are necessary or essential to either institutional security or the rehabilitation of the patients, and it therefore is the finding of the Court that such standards are impermissibly overbroad.

#### Outgoing Mail

■ Plaintiffs also challenge defendants' practice of refusing to mail correspondence addressed to "strange people" such as the Pope or Queen of England. There is nothing whatsoever in the record to suggest that this restriction furthers any legitimate governmental interest, and the Court therefore finds it to be constitutionally impermissible.

Finally, plaintiffs challenge defendants' practice of reading and censoring the outgoing mail of particular patients whose correspondence has been the subject of com-

---

(4th Cir. 1977); *Hardwick v. Ault,* 447 F.Supp. 116, 129 (M.D.Ga.1978).

**20.** For further discussion of the *Procunier* standard as applied to censorship of publications, see *Thibodeaux v. State of South Dakota,* 553 F.2d 558 (8th Cir. 1977); *Blue v. Hogan,* 553

F.2d 960 (5th Cir.), *rehearing denied,* 558 F.2d 605 (5th Cir. 1977); *Taylor v. Perini,* 413 F.Supp. 189 (N.D.Ohio 1976); *Aikens v. Lash,* 390 F.Supp. 663 (N.D.Ind.1975), *aff'd sub nom., Aikens v. Jenkins,* 534 F.2d 751 (7th Cir. 1976).

plaints from persons outside the institution. Defendants concede that this practice is not necessary to the security of the institution, but obliquely suggest that a rehabilitative interest is served by having abusive, threatening or obscene mail that is discovered through this practice referred to the patient's doctor. Defendants also suggest that the institution owes some sort of duty to the members of the public who wish not to be bothered by letters from patients.

■ Defendants' suggestion that the subject practice furthers a rehabilitative interest is unsupported in the record by any expert medical testimony, and therefore is found by the Court to be without merit. The Court also finds unpersuasive defendants' contention that the practice may be justified by reference to the desire of some members of the public not to receive mail from LSH patients. First, the Court knows of no legal duty imposed upon the officials of state mental health facilities to protect the general public from unwanted correspondence. As plaintiffs note, persons who do not wish to receive mail from certain patients may have such mail withheld by their local post offices. More importantly, however, the justification for this practice advanced by defendants is not among those recognized by the Supreme Court in *Procunier* as providing a sufficient basis for restricting an inmate's freedom of expression. Therefore, for the reasons stated above, the Court finds defendants' practice of reading and censoring the outgoing mail of certain patients upon the receipt of complaints to be constitutionally impermissible. *Cf. Finney v. Arkansas Board of Corrections*, 505 F.2d 194 (8th Cir. 1974); *Chiarello v. Bohlinger*, 391 F.Supp. 1153, 1154 (S.D.N.Y. 1975). *Contrast Hardwick v. Ault, supra*, 447 F.Supp. at 129.

In summary, the Court finds the following LSH mail practices to be constitutionally impermissible:

1) the opening of incoming general correspondence outside the presence of the patient;

2) the prohibition upon receipt of magazines and books from any source other than the publisher;

3) the reading and censoring of *all* intra-patient mail, without probable cause;

4) the "verbal guidelines" applied in censoring intra-hospital mail; and

5) the practice of reading and censoring outgoing mail from patients that have been the subject of complaints from members of the public.

Defendants are hereby Ordered to devise and submit for the Court's review within sixty (60) days a comprehensive mail regulation policy consistent with this *Opinion*.

*Issue Sixteen* : Whether the practice of fingerprinting and photographing all patients at LSH and transmitting such information to the Federal Bureau of Investigation and the Ohio Bureau of Criminal Investigation violates such patients' rights guaranteed by the Fourteenth Amendment.

*Facts* :

Upon admission to LSH, all patients, including transferees from civil institutions, are fingerprinted and photographed (Tr. at 667). Patients may not refuse to have their prints or photographs taken (Larimore Depo. at 32).

The fingerprints and photographs, which are "mug shots", of all patients are forwarded to both the Federal Bureau of Investigation (FBI) and the Ohio Bureau of Criminal Investigation (OBCI), although the FBI does not require that such records be sent (Larimore Depo. at 32).[21] Each patient's photograph is kept both in his/her file, and on the ward on which he/she resides. The hospital receives "rap sheets" back from the FBI and OBCI on those patients with criminal records, and these are also kept in the patient's central file (Larimore Depo. at 32).

Patients at civil mental hospitals in Ohio are not fingerprinted or photographed upon admission.

---

21. Nor is there anything in the record to indicate that OBCI requires, or has ever requested, that such records be routinely supplied. *See* Ohio Revised Code § 109.57.

*Conclusions of Law:*

Plaintiffs claim that defendants' practice of requiring that all patients at LSH submit to having their fingerprints and photographs taken, and of sending both prints and photographs to the FBI and OBCI, violates their rights secured by the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

First, plaintiffs assert that the process of fingerprinting and photographing all patients is countertherapeutic, and therefore violates the plaintiffs' right to treatment as secured by the Due Process Clause. In support of their contention, plaintiffs direct the Court's attention to the testimony of Dr. Walter Fox, M.D., who stated that the therapeutic effect of forcing an individual to be fingerprinted and photographed against his wishes would be "negative" (Tr. at 219). Dr. Fox further testified that while every bit of information you can get about an individual is useful, he found going about it in a way that is against the patient's wishes objectionable (Tr. at 220). Finally, Dr. Fox stated that the long-range effect of forcing an individual to be fingerprinted and photographed might not be "so much" "countertherapeutic upon the individual's eventual recovery", as it would be detrimental to his employment opportunities in later life, in that "an awful lot of employers look upon the history of mental hospitalization as a negative factor." (Tr. at 220.)

Defendants oppose plaintiffs' due process claim on the grounds that the record fails to establish a constitutional deprivation, and in the alternative, defendants argue that even if plaintiffs have suffered a cognizable injury, the subject practice is fully justified by the state's need to accurately identify LSH patients, and to obtain, for treatment purposes, their criminal records.

■ The threshold question before the Court is whether defendants' practice of fingerprinting and photographing all LSH patients and forwarding such information to the FBI and OBCI deprives plaintiffs of a liberty interest protected by the Due Process Clause. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In this regard, the Court is unpersuaded by plaintiffs' contention that the mere fact of forcing patients to be fingerprinted and photographed is countertherapeutic and therefore violative of their right to treatment. Although Dr. Fox expressed the view that forcing patients to be fingerprinted and photographed would have a "negative" therapeutic effect, his later comments suggest that such a procedure does not significantly affect a patient's long-term recovery (Tr. at 220). Based upon this record, the Court cannot find that the minimal intrusion which results from the process of fingerprinting and photographing deprives plaintiffs of their right to treatment, or of any other cognizable liberty interest. *See generally Winters v. Miller,* 446 F.2d 65 (2d Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); *Thom v. New York Stock Exchange,* 306 F.Supp. 1002 (S.D.N.Y.1969), *aff'd sub nom., Miller v. New York Stock Exchange,* 425 F.2d 1074 (2d Cir.), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

■ Nor does the Court find merit in plaintiffs' contention that defendants' practice of forwarding the fingerprints and photographs of LSH patients to the FBI and OBCI implicates a protected liberty interest through its effect on the patients' reputations. Without doubt, the characterization of a person as "criminally insane", though to some only "a mark of serious illness", is to others a social stigma and "badge of disgrace." *Compare Wisconsin v. Constantineau,* 400 U.S. 433, 436–37, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). *Contrast Winters v. Miller, supra,* 446 F.2d at 71–72. Proof of that fact alone, however, does not establish a cognizable constitutional claim. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). *Cf. Wisconsin v. Constantineau, supra,* 400 U.S. at 437, 91 S.Ct. 507.

In *Paul,* plaintiff claimed that defendant's conduct in including plaintiff's name on a flyer of "active shoplifters" after he had been arrested for shoplifting, but never tried or convicted on the charge, constituted

action under color of state law depriving him of his constitutional right to due process of law. Though acknowledging that respondent's conduct had inflicted a "stigma" on petitioner's reputation, the Court held:

> While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

424 U.S. at 701, 96 S.Ct. at 1161.

Plaintiffs in the instant case have produced evidence that defendants' practice of forwarding the fingerprints and photographs of all LSH patients to the FBI and OBCI may have a long-term negative effect on the patients' employment opportunities (Tr. at 220). Thus, it could be argued that plaintiffs have established more than a mere stigmatization. However, it is clear from the holdings in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and its progeny, that the fact that government conduct may have a deleterious effect on one's future employment prospects does not result in the kind of "foreclosure of opportunities" which gives rise to cognizable constitutional claims. *Id.* at 574 n. 13, 92 S.Ct. 2701; *Brouillette v. Board of Directors of Merged Area IX,* 519 F.2d 126 (8th Cir. 1975); *Lake Michigan College Federation of Teachers v. Lake Michigan Community College,* 518 F.2d 1091, 1096–97 (6th Cir. 1975). Indeed, the court's discussion in *Paul v. Davis, supra,* suggests that only government action which *disqualifies* one from present and/or future employment results in a constitutional deprivation. *Paul v. Davis, supra,* 424 U.S. at 702–07, 96 S.Ct. 1155.

There is nothing in the record which indicates that defendants' practice of forwarding the fingerprints and photographs of all patients at LSH to the FBI and OBCI

works any change upon plaintiffs' status as heretofore recognized by Ohio law. Accordingly, for the reasons stated above, the Court holds that the defendants have not deprived plaintiffs of any liberty or property interest protected by the Due Process Clause of the Fourteenth Amendment. *Paul v. Davis, supra,* 424 U.S. at 712, 96 S.Ct. 1155.

Plaintiffs further assert that defendants' practice of fingerprinting and photographing all LSH patients, while not fingerprinting or photographing patients confined in Ohio's civil mental institutions, constitutes an unreasonable classification in violation of plaintiffs' right to equal protection under the law. It is defendants' position that they have made a wholly rational classification based upon the criminal and dangerous tendencies of persons confined in LSH vis-a-vis those confined in state civil mental institutions. Defendants further contend that the classification furthers the state's "legitimate police power interest in maintaining identification data on these persons because of their 'dangerousness' to self and possibly to others." Defendants' Post-Trial Brief at 211.

As the subject classification does not interfere with plaintiffs' exercise of any fundamental rights, or operate to the peculiar disadvantage of a subject class, defendants' practices must meet only the standard of "reasonableness" in order to survive constitutional scrutiny. *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *San Antonio Independent School District v. Rodriquez,* 411 U.S. 1, 16, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Differential treatment by the state is permissible under the equal protection clause if it rationally furthers a legitimate governmental interest.

The state's interest in protecting the safety and welfare of its citizens cannot be challenged. Thus, the only issue before the Court is whether taking the fingerprints and photographs of patients at LSH, and

forwarding them to the FBI and OBCI rationally furthers that interest.

 The Court can see an acceptable rationale for taking the fingerprints and photographs of only LSH patients. Patients at LSH have demonstrated dangerous propensities, and in the event of escape do pose a more serious threat to the public than do patients at other state mental institutions. To the extent that the availability of fingerprints and photographs may expedite apprehension of escapees, the Court finds that defendants' decision to fingerprint and photograph only LSH patients establishes a rational classification.

On the record before it, however, the Court finds that defendants have failed to demonstrate that defendants' practice of forwarding all such fingerprints and photographs to the FBI and OBCI furthers that state's interest in protecting the safety and welfare of its citizens. Defendants' claim in this regard is seriously dissipated by the fact that neither the FBI nor the OBCI require that the fingerprints or photographs of LSH patients be forwarded to them. Moreover, defendants have not advised the Court *how* their practice of "identification" furthers the state's interest in safeguarding the public welfare. Certainly such identifications are of no security value to the defendants themselves, as by the mere fact of a patient's confinement at LSH the defendants are on notice of his/her dangerous propensities, and may take the requisite precautions to guard against escape.[22]

 Therefore, for the reasons stated above, the Court finds that the defendants' practice of forwarding the fingerprints and photographs of all LSH patients to the FBI and OBCI does not rationally further a legitimate state interest, and therefore is violative of plaintiffs' rights secured by the Equal Protection Clause of the Fourteenth Amendment.

It is therefore Ordered that defendants should be and hereby are enjoined from routinely forwarding the fingerprints and photographs of all patients confined at LSH to the FBI or the OBCI.

It is further Ordered that defendants forthwith submit requests to the FBI and the OBCI to have all records previously submitted by LSH expunged.

Defendants shall report to the Court when this Order is complied with.

*Issue Four:* Whether it is a violation of the Fourteenth Amendment to allow patients of the self-government committee to recommend punishment and modes of treatment for other patients.

*Facts:*

The majority of patients committed to LSH pursuant to Ohio Revised Code § 2947.25, known as the Ascherman Act [described at p. 849, *supra*], are assigned to the "Ascherman Unit", which consists of four wards, A, B, C and D. Ward C is the most restrictive, and Wards A, B and D are less restrictive.

The "patient self-governing program" at issue herein was operated in the Ascherman Unit by Dr. Rudolph Buki, Director of the Unit, until his reassignment in January of 1977, at which time the program was terminated.[23] The program was in effect on Wards A, B and D of the Unit, and has been described as an attempt to teach the consequences of behavior, and to show patients that irresponsible actions result in the loss of privileges (Stip. 385).

The organizational scheme of the self-government program was somewhat complex, and need not be described in detail here. Various ward committees responsible for hygiene, education, recreational and in-

---

22. As noted above, the Court finds no constitutional deprivation in the mere fingerprinting and photographing of LSH patients. Thus, if a patient should escape from LSH, such records could then be provided to the appropriate law enforcement agencies to assist in the escapee's identification and apprehension.

23. Letter to Special Master John Czarnecki from David G. Latanick, Assistant Attorney General, September 28, 1977.

dustrial activities existed, together with a Unit Committee. The ward committees' functions were both to recommend rules governing patient activities on the wards, and to recommend sanctions when infractions occurred. The procedure for receiving complaints and imposing sanctions worked generally as follows:

When a complaint about specific conduct was received, the accuser was permitted to verify his story before the respective patient committee with witnesses. The accused, however, was not permitted to present witnesses on his behalf (Stip. 391). Based upon the testimony of the patients against the accused, the accused patient's testimony, and other information before the committee concerning the alleged infraction, the committee (or Patient Council) would make its recommendation for punishment (Stip. 391). The sanctions imposed for rule infractions included receipt of demerits, loss of privileges, including loss of commissary, visitation, and yard privileges, assignments to demeaning and make-work jobs, lock-up, transfer to a strong ward, and increase in medication.

The recommendations of the patient committees were subject to review and approval by the charge attendants (Stip. 391), who were not QMHPs. Dr. Buki, who has a medical degree from the Medical University of Helle in Germany, but is not licensed to practice medicine in Ohio, reviewed only major corrective actions (Stip. 390, 399).

A charge attendant could himself file charges against a patient, in which case the fact finding function of the patient committee was avoided, with the committee making only a recommendation as to the proper corrective action. Moreover, an attendant could impose his own punishment, such as transferring the patient to Ward C (Stip. 391).

*Conclusions of Law:*

Plaintiffs challenge the self-government program described above on basically two grounds. First, plaintiffs assert that the program, as operated, does not rise to the dignity of a professional treatment program geared to the individual patients within the program. As a corollary to this argument, plaintiffs contend that the program results in the placement of patients into settings which are more restrictive than is necessary to achieve their treatment goals, and is therefore countertherapeutic. Finally, plaintiffs argue that under the program patients are substantially deprived of their liberty, privileges, and physical and mental well-being, without being afforded the procedural safeguards secured by the Due Process Clause of the Fourteenth Amendment. Plaintiffs extend this challenge to the policies regarding transfers to more restrictive wards, placement in seclusion, increases in medication and loss of major privileges in all units throughout the Hospital, which policies presently afford patients no due process safeguards.

Plaintiffs request the Court to Order all ward and program rules for the entire Hospital reviewed and/or redrafted by a QMHP, and to further order that any disciplinary action for breach of those rules which would result in substantial deprivation to the rights of the patients be conditioned upon the provision of certain due process safeguards.

The Court will address plaintiffs' claims *seriatim.*

*Is the self-government program countertherapeutic and therefore violative of the patient's Fourteenth Amendment rights?*

Considerable expert testimony was adduced at trial regarding the therapeutic value of the self-government program as operated in the Ascherman Unit. To summarize briefly, Dr. Julian Wohl, Ph.D., a psychologist, testified that in his opinion the self-government program did not provide "effective minimal standards of psychological treatment for patients involved therein." (Wohl Depo. at 100.) This opinion was based upon three facts: that participation in the program was forced rather than voluntary; that there was no individualization of therapeutic goals; and that the only apparent goal of the program was to gain conformity to the value scheme of the institution. Wohl further testified that re-

quired participation by all Ascherman Unit patients could, in some cases, be countertherapeutic. (Wohl Depo. at 112.)

Dr. Terry Brelje, Ph.D., a psychologist, likewise opined that the self-government program appeared geared more toward having patients conform to institutional norms than "behavior modification" in a psychological sense. It was Dr. Brelje's opinion that the self-government program didn't appear to be working to the detriment of any patients, but neither did it appear to be working very effectively for patients. (Brelje Depo. at 115.)

Dr. Walter Fox, M.D., a psychiatrist, testified after observation of the self-government program that he did not find the program to be very effective. In this regard, Dr. Fox noted that he found no analysis of common behaviors, no evidence of specific measures of behavior, and no evidence that behavior was being monitored to see whether desirable behavior was being observed more or less frequently. Dr. Fox did state, however, that if the self-government program were run by a QMHP, it could be part of an effective treatment program.

Dr. Carl Clements, Ph.D., a clinical psychologist, also expressed concern with the lack of involvement by professional staff in the self-government program. In his view, the absence of such involvement would result in development of power cliques which would abuse patients at the lower end of the "pecking order." (Tr. at 79–81.) Dr. Clements did state, however, that within a tightly monitored system there is a place for patients determining treatments, punishments or transfers of other patients. (Tr. at 82.) Like Dr. Wohl, Dr. Clements questioned whether all patients in one unit should be treated in exactly the same way. (Tr. at 82.) Dr. Clements also shared Dr. Brelje's and Dr. Wohl's views that the self-government program was geared more towards serving the convenience of the institution than serving a therapeutic or treatment goal (Tr. at 84).

Dr. Kenneth Gaver, M.D., a psychiatrist and also the Director of the Ohio Department of Mental Health and Mental Retardation, expressed the view that a self-government program is desirable when you have patients, such as the Ascherman committees, who may be in the institution for an extended period of time. Similarly, Dr. Gaver expressed the opinion that a self-government program is appropriate for Ascherman patients because it is important for societal adjustment that they be involved in making and enforcing rules. Dr. Gaver concurred in the position of the other experts that the recommendation of punishment by patients is appropriate only if approval by a QMHP is required prior to implementation.

■ While the expert testimony summarized above causes the Court to seriously question the effectiveness, or therapeutic value, of the self-government program formerly operated in the Ascherman Unit, the Court finds little support in the record for plaintiffs' contention that the self-government program was countertherapeutic. Of the several experts who testified on the issue, only Dr. Wohl was of the opinion that participation in the program could, in some cases, be countertherapeutic. The Court finds this testimony insufficient to carry plaintiffs' burden of establishing, by the preponderance of the evidence, a clear constitutional violation.

Absent a finding that the self-government program is countertherapeutic, and therefore violative of plaintiffs' rights under the Fourteenth Amendment, the Court may not enter the relief requested by plaintiffs. The expert testimony clearly demonstrates, however, that the therapeutic value of a self-government program can only be maximized by the integral involvement of QMHPs, and the Court strongly urges the defendants to insure such involvement if a self-government program is instituted again in any unit.

*Does the imposition of such sanctions as loss of privileges, increase in medication, placement in seclusion, and transfer to a more restrictive ward, absent a hearing that comports with minimal due process requirements, constitute a violation of the Fourteenth Amendment?*

Plaintiffs contend that:

[t]he ability of the Patient Committee to impose such sanctions as demerits, loss of privileges, increase of medication, and transfers to a strong ward * * * through a disciplinary proceeding which is not closely monitored by qualified mental health professionals * * * absent a hearing that comports with the minimal requirements of procedural due process constitutes a violation of the Fourteenth Amendment.

Plaintiffs' Post-Trial Brief at 39. Plaintiffs rely upon the authority of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); and several lower court opinions.[24] Defendants, on the other hand, contend that plaintiffs are not deprived of any substantive rights by the operation of the patient self-government program, and therefore have no right to procedural due process. Defendants further argue that even if some minimum procedural safeguards are required, those sought by plaintiffs are more stringent than are constitutionally required.

The Court is aided in its analysis of these questions by the United States Supreme Court's recent opinion in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976),[25] and the Sixth Circuit Court of Appeals' recent opinion in *Walker v. Hughes*, 558 F.2d 1247 (6th Cir. 1977), *rev'g*, 386 F.Supp. 32 (E.D.Mich.1974), both of which addressed the issue of prisoners' rights in disciplinary proceedings.

*Walker* requires that the Court begin its due process analysis by first determining whether a liberty interest within the meaning of the Due Process Clause is implicated. *See Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Whereas several lower courts had earlier concluded that any state action which worsened the conditions of a prisoner's confinement in a serious or substantial way triggered application of the Due Process Clause, *see; e. g., Aikens v. Lash*, 514 F.2d 55 (7th Cir. 1975), *vacated and remanded*, 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976); *Lokey v. Richardson*, 527 F.2d 949 (9th Cir. 1975), *vacated and remanded*, 427 U.S. 902, 96 S.Ct. 3186, 49 L.Ed.2d 1196 (1976); *United States v. Montanye*, 505 F.2d 977 (2d Cir. 1974), *rev'd sub nom., Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the Supreme Court ruled in *Meachum* that an individual's "grievous loss" is not *itself* sufficient to invoke the protection of the Due Process Clause. In the words of the Court:

We reject * * * the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause. In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), a university professor was deprived of his job, a loss which was surely a matter of great substance, but because the professor had no property interest in his position, due process procedures were not required in connection with his dismissal. We there held that the determining factor is the nature of the interest involved rather than its weight.

**24.** *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir. 1971); *Clutchette v. Procunier*, 328 F.Supp. 767 (N.D.Cal.1971), *aff'd*, 510 F.2d 613 (9th Cir. 1975), *rev'd sub nom., Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Morales v. Turman*, 383 F.Supp. 53 (E.D.Tex.1974), *rev'd and remanded*, 535 F.2d 864 (5th Cir. 1976) (on grounds that issues raised required convening three-judge court), *rev'd*, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977), *remanded on rehearing*, 562 F.2d 993 (5th Cir. 1977); *Clonce v. Richardson*, 379

F.Supp. 338 (W.D.Mo.1974); *Nelson v. Heyne*, 355 F.Supp. 451 (N.D.Ind.1972), *aff'd on other grounds*, 491 F.2d 352 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Walker v. Hughes*, 386 F.Supp. 32 (E.D. Mich.1974), *rev'd*, 558 F.2d 1247 (6th Cir. 1977). *See also Carlo v. Gunter*, 520 F.2d 1293 (1st Cir. 1975).

**25.** *See also Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1977), *rev'g*, 505 F.2d 977 (2d Cir. 1974).

427 U.S. at 224, 96 S.Ct. at 2538, *quoted in Walker, supra,* 558 F.2d at 1250. Thus, under *Meachum,* due process analysis of liberty interests must focus upon whether there is an *entitlement* to enjoy the privileges or conditions being adversely affected by state action, rather than upon a finding of grievous loss. *Walker, supra,* 558 F.2d at 1250–51. Therefore, the precise issue before the Court is whether the patients confined in the Ascherman Unit have some kind of liberty entitlement not to be placed in lock-up (seclusion), not to be transferred to a more restrictive (strong) ward, not to be subjected to increases in medication, and not to be deprived of privileges as disciplinary measures. *See Walker, supra,* 558 F.2d at 1252.

It is clear from the holdings in *Meachum* and *Walker* that prisoners *generally* can claim no *per se* entitlement to any of the interests asserted above, with the possible exception of the right not to be subjected to increases in medication. *See Scott v. Plante,* 532 F.2d 939 (3d Cir. 1976); *Souder v. McGuire,* 423 F.Supp. 830 (M.D.Pa.1976); *Nelson v. Heyne,* 355 F.Supp. 451 (N.D.Ind. 1972), *aff'd,* 491 F.2d 352 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974) (holding that administration of tranquilizing drugs to juveniles without trying measures short of medication and without adequate medical guidance constituted cruel and unusual punishment in violation of Eighth Amendment). In *Meachum,* the Court stated:

> [w]e cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause. The Due Process Clause by its own force forbids the State from convicting any person of crime and depriving him of his liberty without complying fully with the requirements of the Clause. But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the constitution.

427 U.S. at 224, 96 S.Ct. at 2538 (*emphasis added*).

Construing *Meachum,* the Sixth Circuit has said:

> It thus appears that prison rules may confine prisoners in more restrictive living status because the Constitution by its own force does not require that prisoners be kept in the general prison population, allow for the transfer of inmates to another prison because the Constitution by its own force does not require that a person be confined to any particular prison * * * or deprive inmates of privileges because the Constitution by its own force does not require that prisoners be given such privileges as participation in rehabilitation programs. The Constitution by its own force permits sanctions to be placed on a prisoner as a result of a disciplinary hearing even though they may virtually end a prisoner's rehabilitation program. The Supreme Court was unpersuaded by the dissenting opinion of Justice Stevens in *Meachum v. Fano, supra,* in which he contended that a prisoner 'has a protected right to pursue his limited rehabilitation goals' that the Due Process Clause would recognize by its own force.

*Walker v. Hughes, supra,* 558 F.2d at 1252. Thus, if plaintiffs were ordinary inmates of the state's correctional system, their due process claims would clearly fail absent a showing that as inmates they enjoyed liberty interests created by either federal or state law.[26]

Persons confined in the Ascherman Unit, however, are no longer within the custody of the Ohio Department of Rehabilitation and Correction, but rather have been indefinitely committed to the Department of Mental Health and Mental Retardation.

26. *See, e. g., Wolff v. McDonnell, supra,* 418 U.S. at 557, 571 n. 9, 94 S.Ct. 2963; *Walker v. Hughes, supra,* 558 F.2d at 1255–56.

The Court has previously determined, per the stipulations of the parties, that all members of the patient population at LSH have a *constitutional* right to treatment, which encompasses a right to be placed in the least restrictive confinement, defined as the minimum limitation of movement or activity of a patient or resident necessary to provide reasonable assurances that his dangerousness would not constitute a significant risk to others and in which treatment or habilitation continues to the fullest extent possible. The Court now holds that because the disciplinary sanctions imposed through the operation of the patient self-government program deprive patients of their right to be confined in the least restrictive environment, a liberty interest is implicated, and minimum due process safeguards are therefore required.

Having reached this decision, it remains for the Court to consider plaintiffs' contention that the due process safeguards articulated above must be afforded not only to the Ascherman Unit patients participating in the self-government program, but to all patients at LSH subject to similar deprivations.[27]

It is clear from the record before the Court that all patients at LSH are deprived of privileges, placed in seclusion or restraints, transferred to more restrictive wards, and subjected to increases in medication on the basis of their behavior. Such deprivations and transfers occur with varying degrees of frequency, and with varying degrees of professional supervision. No due process safeguards are afforded in either emergency or non-emergency situations.

▇▇▇▇▇▇ Having ruled above that such government action deprives patients participating in the self-government program of their constitutional right to be treated in the least restrictive confinement, and therefore requires that minimum due process safeguards be provided, the Court can discern no reason why the constitutional protections afforded patients confined in the Ascherman Unit should not be extended to all patients confined at LSH. As several courts have noted, the right to procedural protection turns upon whether there has been an infringement of a protected liberty interest. A protected interest is no less infringed by government action taken for reasons which purport to serve an administrative or rehabilitative purpose than by government action taken for disciplinary reasons. *Lokey v. Richardson,* 527 F.2d 949, 952 (9th Cir. 1975), *vacated and remanded for reconsideration on other grounds,* 427 U.S. 902, 96 S.Ct. 3186, 49 L.Ed.2d 1196 (1976). *See also Cardaropoli v. Norton,* 523 F.2d 990 (2d Cir. 1975); *Clonce v. Richardson,* 379 F.Supp. 338 (W.D.Mo.1974). Therefore, the Court holds that whatever the motivation for their actions, defendants may not deprive any patients at LSH of major privileges, involuntarily place them in seclusion or restraints, involuntarily transfer them to more restrictive wards, or increase their medication without affording them minimum procedural due process safeguards.

Finally, the Court must determine what process is due. Plaintiffs have urged the Court to adopt the due process requirements enunciated by the district court in *Walker v. Hughes,* 386 F.Supp. 32, 40 (E.D. Mich.1974), which substantially expanded the requirements for prison disciplinary hearings set by the Supreme Court in *Wolff v. McDonnell, supra. Walker,* however, has since been reversed by the Sixth Circuit Court of Appeals, in an opinion which adheres closely to the precise standards enunciated in *Wolff,* and in *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

Defendants, on the other hand, contend that not *all* of the safeguards required by *Wolff* and its progeny in prison disciplinary proceedings are required in the instant case,[28] on the grounds that the rights and

---

27. This position is also advanced by plaintiffs in connection with Issues Nineteen and Twenty, *see Pretrial Order,* to be discussed in a subsequent order.

28. Defendants suggest that one hour's oral notice of the charges against the accused would be adequate, and that a written record of the charges and the disposition would be an ade-

privileges affected are "qualitatively and quantitatively" different from those involved in *Wolff v. McDonnell, supra.* Defendants argue that only *conditions* of confinement are affected by the self-government program, and further assert that a distinction exists between transfers or deprivations of privileges which are made for disciplinary reasons, as in *Wolff v. McDonnell,* and transfers and deprivations of privileges for "treatment" reasons.

The defendants attempt to draw a distinction between deprivations and transfers which are made for disciplinary reasons and those which are made for treatment reasons must fail on the facts of the instant case. While the self-government program generally was designed to operate as a treatment program, it is clear from the record that the purpose of the disciplinary hearings held under the program is to determine whether infractions of the ward rules have occurred, and to discipline the patient for those infractions by further restricting the patient's conditions of confinement. The punishment/treatment dichotomy which defendants seek to rely upon to validate the self-government hearing procedure is, therefore, without basis in fact.

■ Defendants are correct, however, in their assertion that the procedures required to insure due process vary with the precise nature of the governmental function involved, and the private interest that has been affected by the government action. *Walker v. Hughes, supra,* 558 F.2d at 1257, quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Several courts have recognized that minor deprivations, such as the temporary loss of certain privileges, require less procedural protection than do more serious deprivations, such as transfers. *See, e. g., Clutchette v. Procunier,* 510 F.2d 613, 615 (9th Cir. 1974), *rev'd on other grounds sub nom. Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Cardaropoli v. Norton,* 523 F.2d 990, 995 n. 12 (2d Cir.

1975). *See also Wolff v. McDonnell, supra,* 418 U.S. at 571 n. 19, 94 S.Ct. 2963.

The record before the Court demonstrates that the punishments which may be inflicted upon patients in the self-government program range from the loss of privileges, including yard, commissary and visiting privileges, to transfer to a strong ward, lock-up or seclusion, placement in restraints, and increase in medication. In the Court's view, a patient's interest in yard, commissary and visiting privileges is considerably less than his interest in remaining on an open ward, free from seclusion, and not subject to increases in medication. Accordingly, the Court determines that fewer procedural safeguards attach to disciplinary hearings in which the patient is threatened with only loss of privileges than attach to those proceedings in which a patient is threatened with transfer, lock-up, or an increase in medication.

■ Weighing the patient's interest in yard, commissary, visiting and other similar privileges against the state's interest in maintaining an orderly, secure and a rehabilitative environment for all patients, the Court determines that the minimum due process safeguards which must be afforded prior to the withdrawal of patient privileges are:

1) notice (oral or written) of the intent to remove one or more privileges, afforded at a reasonable time prior to the hearing;

2) a hearing before someone other than the complainant, at which the patient may testify; and

3) a written statement of the grounds for removal of the privileges.

*See Clutchette v. Procunier,* 510 F.2d 613, 615 (9th Cir. 1974), *rev'd sub nom., Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (the Supreme Court finding that the Circuit Court had prematurely addressed the issue of what due process rights were triggered by a prisoner's loss of privileges).

quate substitute for a written statement of the finding of fact and the evidence relied upon. Defendants would accept the standards established by *Wolff* regarding the calling and cross-examining of witnesses. Defendants' Post-Trial Brief at 56–60.

 Weighing the patient's interest in being confined on a less restrictive ward, free of seclusion or restraints, and free from increases in medication, against the state's interest in maintaining an orderly, secure and rehabilitative environment for all patients, and guided by the Sixth Circuit's opinion in *Walker v. Hughes, supra,* the Court concludes that the procedural safeguards required before a patient at LSH may be transferred from a less restrictive ward to a more restrictive ward, placed in seclusion or restraints, or subjected to increases in medication, are essentially those articulated by the Supreme Court in *Wolff v. McDonnell, supra.* Specifically, these include:

1) the right to written notice of the charges twenty-four (24) hours prior to the hearing;

2) the right to present his testimony at the hearing and to call witnesses and present evidence on his behalf, unless to do so would unduly endanger institutional safety or rehabilitation goals;

3) the right to a written statement of the findings of fact and the evidence relied upon;

4) the right to have assistance from another resident, or member of the staff, if the accused is illiterate or the issues complex; and

5) the right to have an impartial fact finding body (or person).

*Wolff v. McDonnell, supra,* 418 U.S. at 563–72, 94 S.Ct. 2963. *See also Walker v. Hughes, supra,* 558 F.2d 1256–60; *Lokey v. Richardson,* 527 F.2d 949 (9th Cir. 1975), *vacated and remanded,* 427 U.S. 902, 96 S.Ct. 3186, 49 L.Ed.2d 1196 (1976); *Clutchette v. Procunier,* 497 F.2d 809 (9th Cir. 1974), *on remand,* 510 F.2d 613 (1974), *rev'd on other grounds sub nom., Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Giampetruzzi v. Malcolm,* 406 F.Supp. 836, 848–49 (S.D.N.Y. 1975).

In addition, the use of restraints, seclusion and medication must comport with all the other applicable Court Orders.

The defendants are granted sixty (60) days in which to devise and present for the Court's review a plan which will provide these safeguards. Said plan shall include a statement of the rule infractions which will subject a patient to various changes in the conditions of his confinement, and shall also specify the emergency conditions under which the defendants would deem it necessary to suspend the requirement of a *prior* hearing.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the parties should be and hereby are granted leave to move for reconsideration of this *Order* on or before October 28, 1978.